IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CANAAN CHRISTIAN CHURCH, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. TDC-16-3698 |
| | ) |
| MONTGOMERY COUNTY, MARYLAND, et al., | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION

Before this Court are Plaintiffs Burtonsville Associates and Burtonsville Crossing, LLC's Motion to Compel Responses to Discovery (ECF No. 52) ("Plaintiffs' Motion") and Defendants' Cross-Motion for Protective Order (ECF No. 54) ("Defendants' Motion"), collectively the "Motions." The Court has reviewed the Motions, related memoranda and applicable law. No hearing is deemed necessary. See Local Rule 105.6 (D. Md.). For the reasons presented below, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion.

    **I.    Analysis**

        **A.  Defendants Have Asserted Privileges In A Manner That Is Procedurally Correct.**

Plaintiffs contend that Defendants have made assertions of privilege in a conclusory fashion, failing to set forth specific facts in support thereof. Pls.' Mem. In Supp., at 3-4 (ECF No. 52-1). Defendants have complied with the letter and spirit of the Federal Rules of Civil Procedure and this Court's Local Rules.

Federal Rule of Civil Procedure 26 requires Defendants to (1) "expressly make the claim" of privilege; and, (2) "to describe the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself

1

privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(i-ii). See also Local Rules, Discovery Guideline 10.d.iii.

In their reply briefing, Plaintiffs rightly abandon this issue. Defendants have asserted legislative and executive privileges in a manner that sufficiently identifies the categories of information they view as non-discoverable.

### B. Defendants Have Established The Existence Of Legislative Privilege

#### 1. The Burtonsville Crossing Neighborhood Plan and Zoning Text Amendment are Legislative Acts.

Maryland requires each local jurisdiction to have a comprehensive land use master plan, and to make zoning decisions consistent with their master plans, said plans having the "binding force of law." Pulte Home Corp. v. Montgomery Cty., Case No. GJH-14-3955, 2017 WL 2361167, at *4, (D. Md. May 31, 2017).

In Pulte, this Court wrestled with nearly identical issues regarding water and sewer change applications, and master plan amendments. The Court determined both acts to be legislative in nature. "Planning and zoning actions are legislative when they 'decide questions of law and policy and discretion' and have broad community-wide implications, which encompass considerations affecting the entire planning area or zoning district." Id. (relying on Kenwood Gardens Condos, Inc. v. Whalen Props., LLC, 449 Md. 313, 144 A.3d 647 (2016). In Kenwood Gardens, the court found that the County Council took "into account legislative facts and the impact of the development on the community at large." Id. at 334. Therefore, the master plan and zoning decisions in that case had the "binding force of law" and the resolutions amending the master plan were considered legislative acts.

Plaintiffs readily concede that the Burtonsville Crossing Neighborhood Plan ("BCNP" or the "Plan") and Zoning Text Amendment ("ZTA") 12-13 are "legislative in nature." Pls.' Mem.

in Opp'n, at 20 (ECF No. 56). Defendants set the context for this litigation as being driven by community-wide concerns for the preservation of drinkable water from the Rocky Gorge Reservoir and its tributaries. The foundation for their position rests on the statements set forth in the BCNP. Defs.' Opp'n, at 3 (ECF No. 54-1). The succinct issue here is that Plaintiffs submitted change requests for sewer service which were denied. Plaintiffs dispute the legislative quality of the denial of these change requests.[1]

The BCNP speaks to deep concerns about "declining water quality, sensitive tributary headwaters, high impervious levels, and sewer and water service." Without doubt, the BCNP represents the comprehensive land use master plan for the Burtonsville area. In furtherance of the Plan, the County Council lowered the impervious cap in the Rural Cluster ("RC") zones and declined requested extensions of sewer service beyond a circumscribed envelope. The Plan recommended "no public sewer service should be permitted for any use." Explanation is also provided for the rejection of the 10% impervious cap established by other guidelines, given the environmental sensitivity of the area, as well as the favorable results when an 8% cap had been employed elsewhere. See Defs.' Mot., Ex. 3, p. 45.

### 2. Defendants' Actions Regarding Plaintiffs' Change Requests are Legislative Acts.

In 2003, the County Council adopted a "Ten Year Comprehensive Water Supply & Sewerage Systems Plan" ("Water & Sewer Plan" or "WSP"). Defs.' Mot., Ex. 5. This too was a legislative act. The WSP has been amended over the years. This Court determined long ago that amending a water and sewer plan is also a legislative act. Kent Island Joint Venture v. Smith, 452 F. Supp. 455, 457-58 (D. Md. 1978). The WSP recognizes a policy exception, (i.e. a change

---

[1] Plaintiffs also contend that ZTA 12-13 was "targeted at the pending New Hope Church Sewer Request," and "adopted to target religious land uses." Compl. ¶¶ 171, 180, (ECF No. 1).

3

request), applicable to Private Institutional Facilities ("PIF"). Churches like Plaintiff Canaan enjoy the PIF designation.

Plaintiffs sought a change request under the PIF policy. Plaintiffs' sewer change requests were not favored by the Planning Board, County Executive, Council Staff, nor the Council Committee on Transportation, Infrastructure, Energy & Environment. The County Council adopted the recommendations of these entities and denied Plaintiffs' requests. Plaintiffs claim this was not a legislative act, and therefore not protected by privilege. Defendants assert the County Council had the discretion to deny the request and did so in accordance with the master plan. One of the County's Senior Legislative Analysts commented that the PIF policy allows for changes to the master plan, but "in cases where a master plan has established *specific* water/sewer restrictions for certain areas . . . the Executive, Planning Board, and Council Staff concur that these specific Master Plan recommendations supersede consideration via the PIF policy." Defs.' Mot., Ex. 13, pp. 7-8. Another footnote stated the obvious, that Plaintiffs could build a facility on the land so long at it complied with the zoning requirements.

As to whether the action here was legislative or administrative, the parties agree that Alexander v. Holden, 66 F.3d 62 (4th Cir. 1995) is controlling. In following the lead of several sister circuits, the Fourth Circuit accepted the general principle that

> If the underlying 'facts relate to particular individuals or situations'
> and the decision impacts specific individuals or 'singles out
> specifiable individuals' the decision is administrative." On the
> other hand, the decision is legislative if the facts involve
> 'generalizations concerning a policy or state of affairs' and the
> 'establishment of a general policy' affecting the larger population.

Id. at 66 (internal citations omitted).

According to the WSP, p. 1-23, when a change request is considered within a service envelope, it is described as an "administrative" matter to be addressed by the Maryland

4

Department of Environmental Protection. When a change request is sought by the owners or purchasers of property outside of the service envelope, the decision to grant or deny the request is within the purview of the County Council. This latter scenario is applicable to the subject property here.

Defendants note that the PIF policy is a subpart of the WSP, which by definition is primarily concerned with the impact of water and sewer decisions upon a community at large, and the Burtonsville area in particular. The purpose of the process is to allow the Council to consider the big picture, with input from the affected community. Plaintiffs' suggestion that their change requests converted the nature of this process into a non-legislative endeavor is misplaced. In addition to this Court's decision in <u>Kent Island</u>, several state court decisions in Maryland support Defendants' view.

Defendants rely on <u>Gregory v. Board of Cty. Comm'rs of Frederick Cty.</u>, 89 Md. App. 635, 599 A.2d 469 (Md. Ct. Spec. App. 1991). <u>Gregory</u> makes clear that amendments to water and sewer plans are at least quasi-legislative. Also, <u>Appleton Reg'l. Cty. All. v. Cecil Cty</u>, 404 Md. 92, 945 A.2d 648 (Md. 2008), made it clearer that "all amendments to a Master Water and Sewer Plan are, by definition, comprehensive planning actions." <u>Id.</u> at 655. Finally, in <u>Bethel World Outreach Church v. Montgomery Cty, Md.</u>, 184 Md. App. 572, 967 A.2d 232 (Md. Ct. Spec. App. 2009), the Court of Special Appeals addressed head on the question of the PIF policy within Defendants' water and sewer plan. The Court stated that the Council's action in denying a change request was a legislative one.

Most recently, this Court in <u>Pulte</u> considered the implication of master plan amendments, zoning changes, and water and sewer change requests. It was determined that regardless of the methodology employed, the action at hand was legislative in nature. Clearly, this Court cannot

5

now give countenance to the contention that Defendants' refusal to grant the change requests were tantamount to the mere "enforcement of pre-existing policy" or "enforcement rather than rule-making." Pls.' Mem. in Supp., at 8. On these facts, the denial of Plaintiffs' change request is a legislative act.

This Court does not find helpful the case of Moxley v. Town of Walkersville, 601 F. Supp. 2d 648 (D. Md. 2009). In Moxley, the Court was addressing the defendant's motion to dismiss and the question of legislative immunity. The Court concluded that given the stage of the litigation, requiring that all well-pled allegations be accepted as true, that it could not determine whether the "zoning ordinance constituted a legislative act" for several reasons. Moxley, at 661. Unlike in the present case, the allegation in Moxley was that the ordinance was proposed a mere two days after the sale of the property to a certain religious group was made public. Moreover, upon denial of a special exception to the plaintiff, the ordinance was destined for extinction. The Court concluded that discovery could well reveal that the legislation "relates to particular individuals" and "impacts specific individuals or singles out specifiable individuals" contrary to the parameters of the Alexander v. Holden decision. Id. The allegations here fall far short of the particularity concerns set forth in Moxley.

As the Council looked more to the BCNP for guidance, its decision is better classified as a legislative act. The Council followed the recommendation set forth in the planning document, namely, that there should be no exceptions to the sewer standards in light of the sensitivity of the water conditions of the Rocky Gorge Reservoir and the expressed objections of residents that may be affected. This policy decision is steeped in legislative thought and function which led to the creation of the BCNP. I agree with the conclusion reached in Pulte, that the County's actions with respect to the water and sewer change requests are legislative in nature.

## C. Defendants' Assertions Of Privilege Are Not Required To Yield To Plaintiffs' Claims Under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

### 1. The present claims relate to a private commercial dispute, not "important federal interests."

Plaintiffs contend that this case is merely "about a religious organization seeking to build a house of worship that will meet its religious needs." Pls.' Mem. in Opp'n, at 21. In their effort to avoid the effect of legislative privilege, Plaintiffs seek to classify their claims as asserting an "important public interest or federal civil right." Pls.' Mem. in Supp., at 9. Plaintiffs attempt to distinguish the Pulte decision by observing that the present claims are not based upon the private concerns of a developer.

Defendants contend that certain custodians enjoy absolute immunity. Defs.' Opp'n, at 25-28. Defendants rely on EEOC v. Washington Suburban Sanitary Comm'n, 631 F.3d 174 (4th Cir. 2011). If Defendants were engaged in purely legislative acts, the law prohibits the production of documents as well as prevents the deposition of any person engaged in the relevant legislative activity. The law also eliminates the need to prepare a privilege log.[2]

Redistricting, voting rights and criminal cases are considered "important federal interest" cases which do not allow for absolute immunity. Instructive are the conclusions reached by a three judge panel of this Court slightly more than one year ago. Writing for the Court, Circuit Judge Niemeyer pointed out that in redistricting cases the notion of absolute legislative privilege is rejected. Benisek v. Lamone, 241 F. Supp. 3d 566 (D. Md. 2017). More generally stated, "where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields." United States v. Gillock, 445 U.S. 360, 373, 100 S. Ct. 1185 (1980).

---

[2] Defendants agree that here, not all information enjoys absolute privilege, and have accordingly produced discovery materials from seventeen custodians. Defs.' Opp'n, at 28.

7

Unlike the cases involving redistricting or criminal prosecutions of legislators, the present case involves private parties trying to bring to fruition a commercial transaction. Plaintiffs attempt to elevate their grievances into the special category defined as "important federal interests" by noting that their claims assert violations of a federal statute and the federal constitution. The Court believes that the phrase "important federal interest" means more. Otherwise anytime a litigant merely alleged a violation of the Constitution, federal law, or a federal regulation, then the legislative privilege would vanish. When the courts have spoken of redistricting, voting rights cases or criminal prosecutions of those who make the laws, they are identifying very unique categories of litigation that have far broader impact than the litigants themselves. Here, the only tangible benefit of a successful prosecution is the ability for the sale of land to occur and the building of a house of worship with sewer service. At its core, this is very much a private commercial land dispute.

A closer look at the Pulte decision reveals a very similar fact pattern. In Pulte, the plaintiffs asserted violations of the state and federal constitutions, as well as state and federal statutes. Here, Plaintiffs also assert violations of the federal constitution, as well as federal statutes. While significant, said allegations are still in essence claims of a more private nature, sounding in private grievances for government conduct.

The alleged misconduct here is not of the sort which targets religious practices and beliefs as was the case in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). Here, there was no observable "official action that targets religious conduct for distinctive treatment" behind a shield of "facial neutrality." Id., at 534. The County's action in refusing to extend sewer service to the affected area here merely conformed to the BCNP and

was consistently applied over the years irrespective of whether a change request was made for the construction of a church, housing development, or dog kennel.

The universe of cases is very small in which a sufficiently "important federal interest" has resulted in a court finding that legislative privilege must yield. See Benesik, Bethune-Hill v. Virginia State Bd. of Elections, 114 F. Supp. 3d 323 (E.D. Va. 2015) and Marylanders for Fair Representation, Inc. v. Schaefer, 144 F.R.D. 292 (D. Md. 1992) (redistricting cases); Gillock (prosecution of legislator); and Gravel v. U.S., 408 U.S. 606 (1972) (grand jury investigation). As stated by Defendants, there is no apparent case law supporting Plaintiffs' position in the context of a RLUIPA case. Yet, Defendants have support for their position from a sister court in this circuit. See Chase v. City of Portsmouth, No. Civ. A. 2:05CV446, 2005 WL 3079065 (E.D. Va. Nov. 16, 2005).

### 2. Balancing of Factors to Determine if a Legislative Privilege Should Yield.

Defendants concede that in "important federal interest" cases courts will temper the protections of the legislative and executive privileges, moving from a declaration of absolute privilege, to an assessment on the applicability of a qualified privilege. While the Court agrees with Defendants that Plaintiffs are merely private parties suing to vindicate private rights, the Court will nonetheless look at the balancing of factors typically required in "important federal interest" cases. In doing so, the Court will employ the analysis set forth in Bethune-Hill.

Defendants urge the Court to use a balancing test from N. Carolina State Conference v. McCrory, 1:13 CV 658, 2015 WL 12683665 (M.D. N.C. Feb 4, 2015). The fifth factor in the Bethune-Hill formula ("the purpose of the privilege") is swapped out in McCrory for another ("the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable"). The former approach analyses the purposes of the legislative

9

privilege, while the approach in McCrory was concerned with the somewhat different purposes of the deliberative process privilege. These differing purposes were considered by this Court in Bethune-Hill, with the Court deciding that the approach in McCrory was inappropriate. Bethune-Hill, at 338.

As stated in Bethune-Hill and Benisek, the Court looks to five factors, namely: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the seriousness of the litigation and the issues involved; 4) the role of government; and 5) the purpose of the privilege (i.e. the extent to which the discovery would impede legislative action regarding communications between and among legislators). Bethune-Hill, at 339-42; Benisek at 575-77.

> The first three factors aim to capture the federal interest at stake – courts are more likely to require disclosure of communications that are highly relevant, difficult to obtain elsewhere, and will assist in the enforcement of public rights – while the final two factors reflect our comity interest in minimizing intrusion into the State's legislative process.

Benisek, at 575. With this formula in mind, the Court will now consider each factor.

### a. The Relevance of the Evidence

Defendants rely on case law for the contention that "ordinarily" the courts are not concerned with the motivations of legislative action. See Kenwood Gardens, 449 Md. at 341, 144 A.3d at 665. Plaintiffs argue that they must show purposeful discrimination by Defendants in order to prevail on their Equal Protection claims, relying on a host of factors articulated in Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977). Proof of Defendants' intent to act with a discriminatory animus is required. Documents reflecting legislative deliberations could be helpful to Plaintiffs' claims.

Defendants note that Plaintiffs make no effort to identify the documents or information sought, despite having received nearly 20,000 pages from public legislative records.

10

Nonetheless, "the availability of alternate evidence does not render the evidence sought here irrelevant by any measure." Bethune-Hill, at 341, (quoting Veasey v. Perry, No. 2:13-CV-193, 2014 WL 1340077, at *3, (S.D. Tex. 2014)). This factor favors Plaintiffs "given the practical reality that officials 'seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate . . .'". Id.

### b. The Availability of Other Evidence

As with the first factor, Plaintiffs set forth the need to obtain more direct evidence of the intent of those who participated in the legislative process. As it relates to the legislative privilege, courts have said "'[i]n some extraordinary instances[,] the members [of a legislative body] might be called to the stand at trial to testify concerning the purpose of the official action,' while recognizing that 'even then such testimony frequently will be barred by privilege.'" Benisek, at 574, (quoting Arlington Heights, at 268). The Court does not find this to be an "extraordinary instance" as seen in the redistricting cases. Defendants have produced a significant number of documents which provide great contemporaneous insights over the history of this dispute. While direct evidence would be useful, (if it exists), indirect evidence is also available to show legislative intent. In actuality, Plaintiffs are hopeful that there may be some communication, somewhere, that supports their case theory. Even the Complaint is couched in terms of "information and belief." There have been numerous public hearings, reports and recommendations from a variety of sources, and years of engagement by the parties on this issue in the public arena. This wealth of other available evidence weighs in favor of Defendants.

### c. Seriousness of the Litigation and the Issues Involved

Again, Plaintiffs rely on the fact that the present litigation is not akin to the issues presented in Pulte, denying that this suit is brought by private parties seeking a private remedy.

11

Defendants understandably consider this as a mere commercial dispute affecting private interests.

Defendants support their view by setting forth the long history of how the subject properties were classified before the involvement of Plaintiff Canaan. At present, the Court is not aware of any procedural irregularity or undue influence affecting the legislative process. Equally true, Plaintiffs have no burden to demonstrate such in order to obtain the requested discovery. However, the unrebutted proffers of the history regarding the subject properties show a long-standing concern regarding sewer service going as far back as the Fairland Master Plan of 1997. Long before the involvement of Plaintiff Canaan or even the New Hope Church, the County repeatedly refused to extend sewer service for the area. The 2012 BCNP only strengthened the County's resolve to maintain the status quo.

Plaintiff Canaan came to have an interest in the subject property with full knowledge of these restrictions, but claims a discriminatory animus when the change requests were denied. As stated in Andon, LLC v. City of Newport News, Va., 813 F.3d 510 (4th Cir. 2016), "the language of the RLUIPA demonstrates that Congress did not intend for RLUIPA to undermine the legitimate role of local governments in enacting and implementing land use regulations." Id., at 516. The import of Defendants' position is that while the law prohibits discrimination against religious institutions, it does not require said institutions to receive special considerations. Without minimizing the "seriousness" of the litigation, this factor weighs in favor of Defendants.

### d. The Role of Government

Plaintiffs note that the critical determinations in this lawsuit were made by Defendant Montgomery County Council. They also elected not to sue the councilmembers in their individual capacities, acknowledging that in doing so it would increase the need for legislative

privilege, citing Benisek, 241 F. Supp. 3d at 576. It is clear that the "adverse impact on the individual legislator[]" when not named as a defendant "is minimal." Id.; see also, Bethune, at 341.

Defendants principally rely on Schlitz v. Commonwealth of Va., 854 F.2d 43 (4th Cir. 1988) (overruled on other grounds, Berkley v. Common Council of the City of Charleston, 63 F.3d 295 (4th Cir. 1995)). At the end of the day, whether named individually or not, this is a suit aimed at the actions of the members of a legislative body and its executive. Plaintiffs' position elevates form over substance. At present, the suggested need to discover materials in the possession of each legislator is palpable. This factor weighs in favor of Defendants.

### e. The Purpose of the Privilege

One express purpose of the legislative privilege is to allow lawmakers and staff to focus on public duties by removing the costs and distractions of attending lawsuits. Washington Suburban, 631 F.3d at 181. This factor weighs in favor of Defendants.

In summation, in balancing the quantity and quality of factors, the Court is of the view that the more qualitative advantage is in favor of Defendants. Accordingly, Defendants assertion of legislative privilege is appropriate.

### D. Defendants Have No Obligation To Provide Information That Is Privileged, And No Duty To Provide Information That Is Not Relevant To The Motives Of Those Engaged In The Legislative Process.

The core issue in this case is the motivation of those acting upon Plaintiffs' change requests. Information beyond this issue is far less important, if relevant at all. It is undisputed that Defendants have produced discovery from seventeen custodians who have been identified in this litigation. Defs.' Opp'n, at 28. The only issue in the present discovery dispute, is Defendants' assertion of privilege at it relates to the County Executive, members of the County

Council, and their respective staff. "The legislative privilege is strongest as applied to communications among legislators and between legislators and their immediate aides." Bethune-Hill, at 343, (citing Gravel, 408 U.S. at 616-17).

Defendants rely on the Court's statement in Pulte that, "to the extent that documents exist that are not related to legislative activities, it is not clear how such documents would be relevant to the claims or defenses in this case." Pulte, at *5. In Pulte, as well as the present case, the dominating issue is whether those involved in the legislative process were motivated by religious animus. Information in discovery that does not address this issue is largely irrelevant. Defendants enjoy an absolute privilege as the allegations here do not involve "important federal interests." The federal court for the Eleventh Circuit provided a more extensive discussion.

> Because the only remaining claim in AEA's lawsuit struck at the heart of the legislative privilege, and none of the information sought could have been outside the privilege, there was no need for the lawmakers to peruse the subpoenaed documents, to specifically designate and describe which documents were covered by the legislative privilege, or to explain why the privilege applied to those documents. . . . It was enough to point out, as the lawmakers did, that the only purpose of the subpoenas was to further AEA's inquiry into the lawmakers' motivations for Act 761 and that their legislative privileges exempted them from such inquiries.

In re Hubbard, 803 F.3d 1298, 1311 (11th Cir. 2015). The court in Hubbard stated that to require production of discovery would defeat the purpose of the legislative privilege - - "shielding lawmakers from the distraction created by inquiries into the regular course of the legislative process." Id.

The present situation is no different. Nothing in the present record supports the notion that Defendants engaged in any activity that was not legislative. Likewise, there is no indicia of religious targeting as was seen in case of Church of the Lukumi Babalu Aye, Inc. Moreover, in the public hearings regarding the change requests, the record does not reflect religious outrage by

14

legislators or those offering testimony from the community. Quite the contrary, several entities expressly noted their lack of concern or objection to the presence of a house of worship or religious institution on the properties. The only concern was the impact on an area designated for no further sewer service. Defs.' Reply, Ex. A.

### E. The County Executive Possesses Legislative and Executive Privileges.

#### 1. The County Executive has a legislative privilege on these facts.

To the extent that the County Executive and staff are cloaked with legislative immunity, his motivations are also of no import. The courts do not render meaningless legislative enactments that are otherwise facially constitutional based merely upon alleged improper motives. See United States v. O'Brien, 391 U.S. 367, 383, 88 S. Ct. 1673, 1682 (1968); Arizona v. California, 283 U.S. 423, 455, 51 S. Ct. 522, 526 (1931). Here, it is clear that the County Executive has a role in the legislative process mandated by state law. Md. Code. Ann., Envir. §9-515 (LexisNexis 2014). This obligation descends to the levels involving zoning text amendments under local law.

> Within 5 days following the introduction of any text amendment, a copy must be transmitted to the county planning board for review as set forth below. A copy of the text amendment must also be transmitted to the county executive within 5 days following introduction. The county executive may furnish comments and information as the county executive deems pertinent to the proposed text amendment.

Montgomery County Code, 2004 Zoning Ordinance, § 59-H-9.2.

The Court has no reservation in concluding that the County Executive was functioning within the legislative process for the issues currently before the Court. Defendants have satisfied all the factors, namely: 1) the actor must be a government official or someone working on his behalf; 2) the act itself must fall within the sphere of legitimate legislative activity; and 3) the

15

act's proximity to the legislative arena. Marylanders for Fair Representation, at 299. Here, the County Executive is a government official, the activity was squarely part of the legitimate legislative activity. The work of developing the master plan, and amending it by any process was central to the legislative arena. The same result was previously reached by this Court in Pulte.

### 2. The County Executive has executive privilege generally.

The executive privilege enjoys a legal alias called the deliberative process privilege. The courts have identified three purposes of the privilege, specifically to: 1) allow for the free discussion of alternatives within an agency; 2) eliminate public confusion resulting from a premature release of internal agency discussions that are not in final form; and 3) protect against the chilling affect that could occur if officials were judged on matters before reaching a final opinion or decision. City of Va. Beach v. Dep't of Commerce, 995 F.2d 1247, 1252-53 (4th Cir. 1993). It is the burden of the holder of the privilege to show that the materials sought to be withheld are both "predecisional and deliberative." Id., at 1253. In the end, this privilege is designed to protect the "decision making processes of government agencies; and focus on documents reflecting advisory opinions, recommendations and deliberations" which are part of the process of making policy. NLRB v Sears, Roebuck & Co., 421 U.S. 132, 150, 95 S. Ct. 1504, 1516 (1975) (internal citations omitted).

It is beyond credible argument to suggest that the materials sought in discovery here are not "predecisional and deliberative" and therefore covered by the privilege. "Predecisional documents are 'prepared in order to assist an agency decisionmaker in arriving at his decision.'" City of Va. Beach, at 1253 (citing Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184, 95 S. Ct. 1491, 1500 (1975)). "Deliberative material 'reflects the give-and-take

of the consultative process.'" Id., (citing Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)). The entire process involving the County Executive was for the purpose of exercising judgment in order to guide agency policy. See Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992). Like its evidentiary cousin called legislative privilege, executive privilege is designed to protect a process. The privilege has no application to materials reflecting the views and judgments of the executive branch that arise post decision. This privilege does not protect the essential facts used in the process, but how said facts are considered, reviewed, handled or interpreted by decision makers is out of bounds.

Defendants have been sufficiently specific in asserting this privilege. State and federal case law states that the executive privilege is a "presumptive privilege, with the burden upon those seeking to compel disclosure." Hamilton v Verdow, 414 A.2d 914, 925 (Md. 1980) (citing United States v. Nixon, 418 U. S. 683, 708, 94 S. Ct. 3090, 3107 (1974). Like the legislative privilege balancing test for matters involving "important federal interests," the executive privilege may involve a similar effort for certain types of law suits. Id. Here, Plaintiffs have not satisfied their burden in order to compel disclosure.

A more stringent review of the applicability of the executive privilege might ordinarily be required. Typically, Defendants very well might need to submit a privilege log identifying each document sought to be withheld, along with sufficient information for the Court to determine if the designation of privilege is correct. However here, the same materials held by the County Executive enjoy the benefit of being protected under the legislative privilege. To require the preparation of a privilege log serves no good purpose, and runs afoul of the federal discovery rules regarding the "just, speedy and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

In summary, the County Executive can properly assert both legislative and executive privileges for the materials at hand. In either instance, the Court finds the claim of privilege applicable.

## II. CONCLUSION

Based on the foregoing, the Court finds Defendants' assertions of legislative and/or executive privilege to be applicable to the facts of this case. Accordingly, Plaintiff's Motion is DENIED, and Defendants' Motion is GRANTED.

August 15, 2018 /s/
Charles B. Day
United States Magistrate Judge

CBD/bab