# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CANAAN CHRISTIAN CHURCH,
BURTONSVILLE CROSSING, LLC,
BURTONSVILLE ASSOCIATES,
JENNIFER M. SAREM and
MARION G. SAREM,

      Plaintiffs,

      v.

MONTGOMERY COUNTY, MARYLAND,
MONTGOMERY COUNTY COUNCIL and
ISIAH LEGGETT, *County Executive*,

      Defendants.

Civil Action No. TDC-16-3698

## MEMORANDUM OPINION

Plaintiffs Burtonsville Crossing, LLC ("Burtonsville Crossing"), Burtonsville Associates, Jennifer M. Sarem, and Marion G. Sarem (collectively, the "Landowner Plaintiffs") each own adjacent, undeveloped parcels of land (collectively, "the Properties") in Burtonsville, Maryland, located in Montgomery County, that are presently restricted from receiving sewer service. Plaintiff Canaan Christian Church ("Canaan") has entered into a contract with the Landowner Plaintiffs to purchase the Properties in order to build a 2,000-seat church, contingent on extending the public sewer line to the Properties. To that end, in 2013, Plaintiffs filed Water and Sewer Category Change Requests ("WSCCRs") seeking an exception to the sewer restriction. In 2015, those WSCCRs were denied. Plaintiffs have now filed suit against Defendants Montgomery County, Maryland; the Montgomery County Council; and County Executive Isiah Leggett (collectively, "the County") asserting that the denial of the WSCCRs violated their rights under various

provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5 (2018), as well as their rights under the Free Exercise Clause of the First Amendment to the United States Constitution and under the Equal Protection Clause of the Fourteenth Amendment.  The County has filed a Motion for Summary Judgment seeking judgment as a matter of law on all of Plaintiffs' claims.  Plaintiffs, in turn, have filed a Cross Motion for Summary Judgment on all of their claims.  The Court has reviewed the submitted materials and held a hearing on the Motions on September 23, 2020.  For the reasons set forth below, the County's Motion for Summary Judgment will be GRANTED, and Plaintiffs' Cross Motion for Summary Judgment will be DENIED.

## BACKGROUND

### I.      Land Use Regulations

The land on which Canaan proposes to build a church is located in Burtonsville, Maryland, within the Patuxent River watershed ("the Patuxent Watershed").  It sits in a triangular area bounded on the east by U.S. Route 29, on the west by Old Columbia Pike, and on the north by Dustin Road.  The land consist of five adjacent parcels (collectively, "the Properties") totaling 38.5 acres:  parcels 95, 226, 230, 293, and 365.  Parcel 95 is owned by Marion Sarem; parcels 226 and 230 are owned by Jennifer Sarem; parcel 293 ("the BA Parcel") is owned by Burtonsville Associates; and parcel 365 ("the BC Parcel") is owned by Burtonsville Crossing, whose president is Thomas Norris.  None of the parcels has public water or sewer service, but the Properties abut other parcels that do have public water and sewer.

Prior to 1981, the Properties were zoned "Rural."  Joint Record ("J.R.") 178, ECF No. 142. In 1981, the Eastern Montgomery County Planning Area Master Plan ("1981 ECMP") rezoned the Properties to "Rural Cluster" ("RC").  The RC zone allows residences and religious assemblies as

permitted uses.  The 1981 ECMP recommended that sewer service not be extended to property covered by the 1981 ECMP lying inside the Patuxent Watershed, citing concerns about adverse effects on the regional water supply.  In 1993, the Functional Master Plan for the Patuxent River Watershed created a "Primary Management Area" ("PMA"), an area designed to function as a "stream buffer," land that acts as a transition area between a stream and any development, as a means to ensure water quality. J.R. 407.  The PMA included either some or all of the Properties.

In 1997, the Fairland Master Plan was adopted, and it recommended, as to the area in which the BC Parcel is located, that no more than 10 percent of the area of a property could have an impervious surface, and that sewer service not be extended there, with water service to be evaluated on a case-by-case basis.  As for the BA Parcel, the Fairland Master Plan recommended that water and sewer be permitted on a case-by-case basis for special exception uses, defined as day care or elderly housing.  The remaining parcels within the Properties fell under the Fairland Master Plan's general recommendation that future development should be limited to the already existing commercial area.

In 2012, the County adopted a new master plan, the Burtonsville Crossing Neighborhood Plan ("BCNP"), which amended the 1997 Fairland Master Plan.  In the BCNP, the Properties are again zoned RC and designated part of the "Rural Edge Neighborhood." J.R. 275.  Under the BCNP, properties in the Rural Edge Neighborhood "should retain their low-density zoning to protect the Patuxent River Watershed," and "[n]ew development … will be limited to eight percent imperviousness without development in the stream buffers and without public sewer." J.R. 275.  As to the northern part of the Rural Edge Neighborhood, in which the Properties are located, the BCNP specifically recommends that "no public sewer service should be permitted for any use." J.R. 278.  The BCNP explained that these recommendations were prompted by declining water

quality in the Patuxent Watershed and were intended to protect the Patuxent River tributary headwaters, which originate in Burtonsville.

## II.     The Water & Sewer Plan

In 2003, the County adopted the Comprehensive Ten-Year Water Supply and Sewerage Systems Plan ("the Water & Sewer Plan"), which designates the Properties as W-6 and S-6, signifying areas for which there is no planned community water and sewer service within the 10-year scope of the plan or beyond.  Those designations were consistent with the prior water and sewer designations for the Properties.  The Water & Sewer Plan includes a Private Institutional Facilities Policy ("the PIF Policy"), which provides a procedure for federally tax-exempt organizations such as religious institutions to submit a "category change request" that would allow for an amendment to the Water & Sewer Plan designations in order to provide them with water and sewer services.  J.R. 438-39; Joint Statement of Undisputed Facts ("JSUF") ¶¶ 46-47, ECF No. 141.  For private institutional facilities ("PIFs") seeking a category change for land outside the existing sewer envelope—the area intended to receive public sewer service under a water and sewer plan—a WSCCR "may be approved" for sites that abut existing or approved water or sewer mains.  J.R. 439.  In general, however, the Water & Sewer Plan provides that water and sewer decisions "should follow and implement the land use development guidelines established in the County's General Plan and local area master plans."  J.R. 425.

As to PIFs, the Water & Sewer Plan expressly notes that "issues affecting private institutional uses" cannot be addressed only "within the context of the Water and Sewer Plan." J.R. 432.  Instead, proposed PIF uses would need to be addressed "in the context of … master plans, zoning and subdivision ordinances, and water quality regulations."  J.R. 432.  In particular, "[a]mong the concerns" that have arisen as a result of the implementation of the PIF Policy is that

it had "promoted speculative interest in sites because of their potential ability to satisfy the PIF policy requirements, not because a specific private institution has a need for that site." J.R. 431. Another concern was that the PIF Policy "cannot address issues beyond the scope of the Water and Sewer Plan, such as community compatibility, traffic congestion, and alternate facility uses." J.R. 439-B.

Category change requests, through the PIF Policy or otherwise, are made by filing a WSCCR with the Montgomery County Department of Environmental Protection ("DEP"). The DEP requests comments on the WSCCR from the Montgomery County Planning Board ("Planning Board"), the Washington Suburban Sanitary Commission ("WSSC"), and other agencies. The WSCCR and comments from those entities are then sent to the County Executive, who sends the application and his recommendation to the Montgomery County Council ("the Council"). Separately, the Planning Board holds a public hearing on the WSCCR, after which it provides its own, formal recommendations to the Council. After holding its own public hearing on the WSCCR, the Council then takes one of four actions: (1) approves, (2) conditionally approves, (3) defers, (4) or denies the WSCCR. Any approved WSCCR is then subject to review and approval by the Maryland Department of the Environment.

## III.    History of Development Proposals

In 1997, presumably in the wake of the 1997 Fairland Master Plan recommendation that special exception uses such as day cares or elderly housing be encouraged, Burtonsville Associates filed a WSCCR seeking a category change from W-6 and S-6 to allow sewer service on the BA Parcel to support the development of senior housing. That WSCCR was initially deferred and then ultimately denied based on issues related to transportation and the lack of medical facilities.

In 2002, the previous owner of the BC Parcel filed a WSCCR seeking sewer service for the development of residential housing and a dog kennel on that parcel, but that request was never approved.

In 2003, Burtonsville Associates filed two WSCCRs for the BA Parcel, one seeking water and sewer for a senior housing project on the northern end of the parcel and the other seeking water and sewer for a church or other special exception use on the southern end of the parcel. In December 2004, the Council deferred the WSCCR relating to the senior housing project, in part to await Planning Board approval of a preliminary plan that did not require a special exception, and it deferred the WSCCR relating to the church or other special exception use pending the submission of a more definite proposal and the outcome of a proposed zoning text amendment relating to impervious area caps in rural zones. In November 2005, the senior housing WSCCR was deferred again for the same reasons, while the church or other special use WSCCR was denied. In December 2007, Burtonsville Associates filed another WSCCR, this one seeking water and sewer to develop senior housing on the entire BA Parcel. That WSCCR was denied in October 2008 as premature because the 2003 senior housing WSCCR remained pending. Presumably, the 2003 senior housing WSCCR was later denied or abandoned.

On July 27, 2009, Burtonsville Crossing filed a WSCCR requesting water and sewer to develop for-profit senior housing on the BC Parcel.

## IV.   New Hope

In January 2009, New Hope Korean Church ("New Hope") entered into a contract ("the First New Hope Contract") with Patuxent Ridge, LLC, a company owned and managed by Thomas Norris ("Mr. Norris"), president of Burtonsville Crossing, and his wife Elizabeth Norris ("Ms. Norris"), to purchase the BA Parcel. The contract was contingent on Burtonsville Associates

securing water and sewer service for the parcel.  When entering into the First New Hope Contract, New Hope was not aware that an extension of the water and sewer lines to the BA Parcel would require a category change.  Mr. Norris had told New Hope that the parcel could be built upon and that extending water and sewer to it would not require any category change.  J.R. 667.  In meetings between County officials and New Hope's pastor and attorney in early 2009, New Hope learned that a category change would be required, and that the County considered the proposed large church supported by water and sewer to be "too intense" a use and would likely allow only a small church operating with wells and a septic tank.  J.R. 664, 669, 768-70.  By April 1, 2009, New Hope's attorney was aware that the church faced an "uphill battle" and that the proposal was "unlikely to be approved, " J.R. 665,  and New Hope's pastor, Elijah Ahn, realized that it would be "very difficult" to obtain approval.  J.R. 768-70.  Where the parties could not agree on whether to extend the period to study the feasibility of the project, the First New Hope Contract expired in April 2009.  J.R. 668.

After the first contract was terminated, Mr. Norris asked New Hope whether it would still be interested in purchasing the BA Parcel if he could first secure the required category change. New Hope said that it would.  On July 27, 2009, Burtonsville Associates filed a WSCCR ("the New Hope WSCCR") seeking a category change based on the PIF Policy for development of a place of worship.  The application listed New Hope as well as two other congregations as the possible occupants of the place of worship.  In November 2009, New Hope entered into a second contract to purchase the BA Parcel, with the option to terminate if the New Hope WSCCR was not approved by June 30, 2010.  New Hope later terminated that contract, but in April 2010 it entered into a third contract ("the Third New Hope Contract") to purchase the BA Parcel.  By means of

various assignments, in May 2010, Burtonsville Crossing, not Patuxent Ridge, secured the right to sell the BA Parcel to New Hope.

On July 19, 2011, the Council passed Resolution 17-217, which denied Burtonsville Crossing's still pending 2009 WSCCR seeking water and sewer to build for-profit senior housing. Resolution 17-217 also deferred the New Hope WSCCR pending submission of a revised development plan reducing impervious surface area to closer to ten percent, development of water and sewer extension alignments in sufficient detail to verify that they met PIF Policy requirements, and coordination of the plan with local civic, homeowner, and environmental groups.

In the wake of the deferral of the New Hope WSCCR, New Hope terminated the Third New Hope Contract and began to consider other locations for its church. In emails dated October 18, 2011 and November 5, 2011, Mr. Norris acknowledged that there was no longer any contract between New Hope and Burtonsville Associates. As of November 2011, New Hope had received a refund of its deposit under the Third New Hope Contract. In February 2012, New Hope's attorney emailed Alan Soukup, a Montgomery County DEP official who processes WSCCRs, and formally withdrew New Hope's participation in the New Hope WSCCR.

## V.     Burtonsville Crossing Tax Appeals

Meanwhile, in August 2009, Burtonsville Crossing filed an appeal with the Maryland Property Tax Assessment Appeal Board of the assessed value of the BC Parcel, asserting that it was too high because the land was not buildable. In that appeal, Burtonsville Crossing asserted that only 1.33 acres of the 11 acres of the lot are usable because of "environmental restrictions." J.R. 965. On a site plan submitted as part of the appeal, Ms. Norris had written, "This Lot is covered with restrictions that makes it impossible to build. Blame the County." J.R. 977. Ms. Norris further annotated various parts of the site plan with the abbreviation "PMA," referring to

the Primary Management Area, accompanied by arrows designating the PMA lands.  J.R. 977.  In August 2010, Burtonsville Crossing won its appeal, and the assessed value of the BC Parcel for 2009 was reduced.  Based on similar arguments, Burtonsville Crossing successfully appealed the tax assessments for 2010 and 2011 as well, with the assessed value further reduced.

## VI.    The BCNP and the Townhouse Campaign

In 2010, while the New Hope WSCCR was still pending, the Planning Board, at the direction of the Council, began the process of developing a new master plan for Burtonsville— which eventually became the BCNP—as an amendment to the 1997 Fairland Master Plan.  In January 2011, the Planning Board approved the scope of work for the BCNP, which focused on the commercial core of Burtonsville and did not include the Properties within its sweep.

In June 2011, Mark Sarem, the son of Jennifer Sarem, testified before the Council's Transportation and Environment Committee.  During his testimony, he advocated for an amendment to the Fairland Master Plan that would provide water and sewer service to the Properties, a request that was consistent with the views of all of the Landowner Plaintiffs.  Also in 2011, at a public hearing before the Council relating to the pending WSCCRs, the Landowner Plaintiffs requested that the Properties be included in the BCNP.  On July 19, 2011, as part of the Council's action on the two remaining WSCCRs, the Council requested that the Planning Board include the Properties within the scope of the BCNP.

On June 7, 2012, the Planning Board held a public hearing on the draft BCNP.  At that meeting, and in a letter to the Planning Board dated June 21, 2012, Michael Nagy, an attorney for the Landowner Plaintiffs, noted that the Landowner Plaintiffs had previously asked for the Properties to be included in the BCNP and presented a proposal for rezoning the Properties from RC to RT-6, which would permit the building of residential townhouses.  Beginning in July 2012,

the Landowner Plaintiffs began a comprehensive campaign to secure the rezoning.  They created

the "Committee to Save Burtonsville" and submitted to the County a 70-plus page report entitled

"Burtonsville in Crisis:  Solutions for Revitalization" in which they advocated for the RT-6 zoning

change and described the Properties as best used to create Burtonsville's "new residential core."

J.R.   1440.   The   Landowner   Plaintiffs   created   an   accompanying   website,

www.saveburtonsville.com, and started a petition to have the Properties rezoned to RT-6.  At a

July 12, 2012 public hearing, Nagy presented the townhouse development plan and also advocated

for rezoning to R-60, which would allow both for a mix of townhouses and detached single-family

homes.

On July 26, 2012, the Planning Board approved a draft of the BCNP and forwarded it to

the County Executive for review.  The County Executive provided his recommendations and

analysis on the BCNP to the Council on September 14, 2012, and on September 20, 2012, the

Council held a public hearing on the BCNP.   Nagy expressed the Landowner Plaintiffs'

"disappointment" in the draft BCNP because they had sought the inclusion of the Properties in the

BCNP based on the belief that "their properties would be analyzed for their highest and best uses."

J.R. 1408.  Instead, he asserted, the recommendations in the BCNP amounted to "takings" that

would render the Properties "virtually worthless."  *Id.*  He complained specifically about the

recommendations that the Properties remain zoned RC, that the imperviousness cap be reduced

from ten percent to eight percent, and that the extension of public sewer to the area including the

Properties "for any use"  be precluded.  *Id.*  Nagy went on to again pitch the residential

development plans and asked the Council to reject the recommendations in the draft BCNP.

On December 4, 2012, the Council adopted the Planning Board's draft BCNP with some

modifications  and  revisions,  but  leaving  intact  the  recommendations  that  the  "Rural  Edge

Neighborhood" remain zoned RC, that new development there be limited to eight percent imperviousness, and that, as to the northern part of the Rural Edge Neighborhood in which the Properties are located, "no public sewer should be permitted for any use." J.R. 278.  According to Katherine Nelson, an environmental planner for the Planning Board who was involved in the drafting of the BCNP, the sewer restriction was imposed based on the facts that sewer lines degrade over time and therefore could result in pollution in the Patuxent Watershed, and that they enable high-density development which would place the sensitive tributary headwater environment at risk.  The same day that the BCNP was adopted, the Council adopted Zoning Text Amendment 12-13 ("ZTA 12-13"), officially codifying an eight-percent imperviousness requirement in RC zones.

On January 31, 2013, Mr. Norris sent an email to his fellow Landowner Plaintiffs criticizing the County's decision on the BCNP and discussing "Plan B," to pursue "church use that cannot be denied."  J.R. 1883.  On February 22, 2013, based on a recent federal court decision adverse to the County relating to a different parcel of land, Mr. Norris sent an email to his fellow Landowner Plaintiffs stating his belief that the County would not be allowed to deny sewer or "in any way limit or stop large church development" on the Properties.  J.R. 1878.  He further stated, in reference to discussions with the County about the Properties, that "I warned them that if they refused townhouses, there would be churches on this land that will not pay any taxes.  Now they look pretty stupid."  J.R. 1878.

## VII.   Canaan

In February 2013, Mr. Norris began discussions with real estate agent Nurit Coombe, acting on behalf of Canaan, about the sale of the Properties.  Canaan was established in 1996 as a small, 20-person congregation, but under the direction of Pastor Rene Melara, it had outgrown its

current, 250-seat church.  By 2013, it was required to have multiple services to accommodate its

membership and had to curtail a number of other church-related functions and programs due to its

space constraints.  Canaan was looking for a site on which to build a facility that would allow its

2,000 members to assemble for church services and would accommodate a variety of other church-

related functions, including some requiring a commercial kitchen.

Mr. Norris advised Coombe that the Landowner Plaintiffs had been unable to get the

Properties rezoned for townhouses but assured her that, because Canaan was a church, "[t]he

County cannot delay or hinder development in any way" because churches were a "by right" use

in the RC zone.  J.R. 1887-88.  However, after Coombe spoke with Soukup about the possibility

of building a church on the Properties, she reported to Mr. Norris that Soukup had "expressed his

huge doubts about the possibility of allowing new development based on the new [BCNP]."  J.R.

1886.  Mr. Norris assured her that Soukup was "poorly informed," because, although "the County

would deny church development if they could, because they don't want any growth in this area,"

they could not stop a church from being built, because churches were permitted uses in the RC

zone and no special exception was required.  J.R. 1885.  Coombe responded by emphasizing that

the issue was public sewer and directing Mr. Norris to the portion of the BCNP recommending no

public sewer extensions into the RC zone.  Mr. Norris assured Coombe that he had "read all such

info," but that it was irrelevant to the building of a church, and he offered to assist Canaan in

finding a law firm to advise it in dealing with the County.  J.R. 1885.  Coombe later reported to

Pastor Melara that although Mr. Norris was "insisting" that there would be no problem with water

and sewer, she had received "far … different information" from the County.  J.R. 1909.

In June and July 2013, Canaan entered into five different contracts—one for each of the

parcels—to purchase the Properties ("the 2013 Contracts").  The contracts were contingent on

being able to secure public water and sewer service.  On June 26, 2013, the Landowner Plaintiffs submitted four WSCCRs based on Canaan's PIF status ("the Canaan WSCCRs"), requesting that the Properties be reclassified from W-6 and S-6 to W-3 and S-3, defined as areas for which construction of new water and sewer lines is "given immediate priority" and will generally be provided within two years of an approved request.  J.R. 423.  Although installation of septic systems also requires approval through the WSCCR process, the Canaan WSCCRs made no mention of obtaining septic as an alternative to public water and sewer.

On July 30, 2013, however, Canaan terminated the 2013 Contracts, explaining that after "thorough" discussions with their attorneys and the County, they decided that "this project has a low probability to go thr[ough]."  J.R. 2038.

In May 2014, Canaan entered into another contract, this one with all of the Landowner Plaintiffs, to purchase the Properties ("the 2014 Contract"), again expressly contingent on securing approval for public water and sewer that was acknowledged to be presently unavailable, but with the added qualification that the 2014 Contract would remain in force if it were determined that well and septic installations would be sufficient to meet Canaan's needs.  The 2014 Contract also expressly provided that because Canaan is a church, "by virtue of [RLUIPA]," Canaan "brings to this bargain a benefit and a value which would not otherwise be available to Sellers and would probably consign the Propert[ies] to very limited single-family development or to be used only as park land by Montgomery County."  J.R. 2041–42.  It further provided that the Landowner Plaintiffs had identified an attorney to assist with the WSCCR and that if it was not approved, the Landowner Plaintiffs and the attorney, in the name of Canaan, would "at once" file a lawsuit in federal or state court to compel the County to grant the category change request.  J.R. 2043.

In June 2014, Canaan submitted a sketch plan for the facility it hoped to build on the Properties.  That plan depicted a 2,000-seat church with a youth and adult bible study wing, a narthex, offices, meeting space, choir space, an outdoor amphitheater, 500 parking spaces, an athletic field, and a possible future youth center.

In assessing the feasibility of providing sewer to the Properties, the WSSC determined that it would be possible to extend the sewer line to the Properties via a connection to a sewer along Sandy Spring Road, with the extension abutting five other properties.  WSSC identified another possible sewer path but concluded that it would make public sewer service available to many properties along Old Columbia Pike that were not otherwise eligible for sewer, which would be inconsistent with the PIF Policy.  The County Executive's April 2015 Staff Report, however, recommended denial of the Canaan WSCCRs, explaining that while sewer projects outside the sewer envelope may be considered under the PIF Policy, the BCNP "makes sewer recommendations for this area" and "specifically recommends against the provision of public sewer service for any use." J.R. 2102.  The report concluded that because the BCNP had no express recommendation as to water, water service could be provided, but it appeared that water service alone would be insufficient to meet Canaan's proposed needs.  Where neither Canaan nor the Landowner Plaintiffs has submitted any requests seeking approval for a septic system for the Properties, there were no septic feasibility studies conducted.  Since the onset of the present litigation, the County has engaged an engineering expert who has determined that a septic system on the Properties could be installed but would accommodate only an 800-seat church.

On May 12, 2015, the County Executive submitted a memorandum to the Council formally recommending that the Canaan WSCCRs be denied, reiterating that while the Fairland Master Plan allowed consideration of water and sewer extension requests for the relevant area, the BCNP

specifically called for no such sewer extensions. Granting the Canaan WSCCRs under the PIF Policy would thus "be in direct conflict with the Council's recent and specific land use decisions for this part of Burtonsville." J.R. 2076.

As part of this same memorandum, the County Executive recommended approving a WSCCR to permit water and sewer service for Montrose Baptist Church, which was planning to develop an RC-zone property in Rockville, Maryland that was outside the sewer envelope and on which would be built a sanctuary, private school, and child development center.

At a June 18, 2015 meeting, the Planning Board unanimously agreed with the recommendations relating to the Canaan WSCCRs, concluding that the requests did not conform to the BNCP, which recommended "'no public sewer service should be permitted for any use' for these properties." J.R. 2128. The Council held a hearing on the WSCCRs on June 23, 2015, at which Mr. Norris agreed that the WSCCRs did not conform to the BCNP but asserted that the BCNP was "not legal" because it's "illegal to take a church and say, 'You cannot have water and sewer.'" J.R. 1906. He accused the County of "breaking federal law" and threatened litigation. *Id*.

On June 29, 2015, the Transportation and Environment Committee met to review the Canaan WSCCRs and agreed with the conclusion of the County Executive because the "key issue" was that the "Master Plan for this area specifically recommends against sewer for this area for any use." J.R. 2134. In light of the "specific restrictive language" of the BCNP, the Committee recommended that the WSCCRs be denied in their entirety because there was no recommendation for the approval of water if sewer were denied. *Id*. On July 21, 2015, the Council passed Resolution 18-217, which denied the Canaan WSCCRs. Canaan's compliance with the eight percent imperviousness cap was not a basis for the denial of the Canaan WSCCRs, and Canaan

15

has acknowledged that as to its church plans, imperviousness has "never been the problem."  J.R. 96.

On September 26, 2016, Canaan and the Landowner Plaintiffs entered into a Modification Agreement on the 2014 Contract, extending the time for performance to September 2017 and noting  that "[c]entral" to that contract was the understanding that the parties would file a lawsuit in an effort to achieve the approvals necessary for Canaan to build its church.  J.R. 2061.

## VIII.   Comparator Properties

In 2012, the Council approved two WSCCR for PIFs, one for the Shri Mangal Mandir Religious Educational and Charitable Trust ("Shri Mangal") and one for the Glenstone Museum.

### A.      Shri Mangal

Shri Mangal is located in Ashton, Maryland on a property zoned as RE-2, for residential properties, located in the Sandy Spring/Ashton Master Plan area, which is not within the Patuxent Watershed.  Shri Mangal had an existing temple on the property that used septic service and was seeking sewer service for a new, adjacent congregation center.   The Planning Board had recommended denial of the WSCCR, citing conditions in the Sandy Spring/Ashton Master Plan relating to public sewers, but the County Executive recommended approval, and the Council ultimately approved the WSCCR.

In recommending approval, the Council staff noted that the PIF Policy permitted sewer extensions to serve existing PIFs such as Shri Mangal if they "do not threaten to open undeveloped land to development contrary to the intent of the local master plan."  J.R. 3474.  The Sandy Spring/ Ashton Master Plan did not contain any specific provision against the extension of public sewer to properties zoned RE-2 such as the Shri Mangal property.  Sandy Spring Ashton Master Plan at 80, 85,  *available    at*   http://montgomeryplanning.org/wp-content/uploads/2016/09/SandySpring-

AshtonMasterPlan1997ocr300.pdf (last visited September 24, 2020); *see* Fed. R. Evid. 201(b)(2) (permitting courts to take judicial notice of facts not subject to reasonable dispute).

### B.    Glenstone Museum

The Glenstone Museum in Potomac, Maryland is located on a RE-2 zoned property in the Potomac Subregion Master Plan area.  The Glenstone Museum was seeking public sewer service for the original museum and for a new, larger museum building on the property, which is located outside the sewer envelope.  The Glenstone Museum had been serviced by septic but was seeking to avoid having to increase the size of its septic fields, which would limit its ability to place sculptures on the property.  Its application contained a proposal for an extension of the sewer line that conformed to the PIF Policy.  The Planning Board recommended denying the WSCCR because it did not meet the criteria for sewer extensions in the Potomac Subregion Master Plan. The County Executive recommended approval, and the Council ultimately approved the change request.

The Potomac Subregion Master Plan generally recommends that sewer extensions be granted in accordance with the Water & Sewer Plan, which would "generally exclude" water and sewer from RE-2 properties, though the Master Plan supports "limited approvals" of sewer extension to areas within and on the periphery of the sewer envelope, with the focus to be on properties abutting existing sewer lines.  Potomac Subregion Master Plan at 23, *available at* https://montgomeryplanning.org/community/plan_areas/potomac/master_plans/potomac/docume nts/Potomac_Subregion_Master_Plan_v3_ocr.pdf (last visited Sept. 24, 2020); *see* Fed. R. Evid. 201(b)(2).  It does not contain restrictive language comparable to that of the BCNP.

### IX.   Procedural History

Plaintiffs filed suit in this Court on November 14, 2016 asserting five causes of action:  (I) that the County imposed and implemented land use regulations in a manner that substantially burdened the religious exercise of both Canaan and New Hope, in violation of RLUIPA, 42 U.S.C. §§ 2000cc(a) ("the RLUIPA Substantial Burden Claim"); (II) that the County imposed and implemented land use regulations that unreasonably limit religious structures within a jurisdiction, in violation of RLUIPA, 42 U.S.C. §§ 2000cc(b)(3) ("the RLUIPA Unreasonable Limits Claim"); (III) that the County imposed and implemented land use regulations in a manner that treated Canaan and New Hope on less than equal terms than a nonreligious institution, in violation of RLUIPA, 42 U.S.C. §§ 2000cc(b)(1) ("the RLUIPA Equal Terms Claim"); (IV) that the County violated the First Amendment rights of both Canaan and New Hope to free exercise of religion ("the Free Exercise Claim"); and (V) that the County violated the Fourteenth Amendment rights of both Canaan and New Hope to equal protection of the law ("the Equal Protection Claim").

The parties have completed discovery and have now filed Cross Motions for Summary Judgment, with each side seeking summary judgment on all claims.

### DISCUSSION

In its Motion, the County asserts, as threshold issues, that the Landowner Plaintiffs lack standing to assert the RLUIPA Claims and the Free Exercise Claim.  The County also asserts that all claims asserted on behalf of New Hope are barred by the statute of limitations.

On the specific claims, the County asserts that the RLUIPA Substantial Burden Claim fails as a matter of law because Plaintiffs had no reasonable expectation of being able to build a 2,000-seat church on the Properties, and that there is no absolute bar on religious use, as the Properties remain available for religious use.  As to Burtonsville Crossing only, the County argues that the

RLUIPA Substantial Burden Claim is barred by judicial estoppel and collateral estoppel.  On the RLUIPA Unreasonable Limits Claim, the County argues that it fails because there is no jurisdiction-wide restriction on where religious assemblies can be located.  The County asserts that the RLUIPA Equal Terms Claim fails because the statutes at issue are facially neutral, and Plaintiffs cannot identify a necessary and adequate comparator to establish differential treatment. As for the Equal Protection Claim, the County argues that there is no evidence of discrimination based on religion, and that there is a rational basis for the County's action.  The County asserts that Plaintiffs' Free Exercise Claim fails because the RLUIPA Substantial Burden Claim fails and because there is a rational basis for the County's decision to deny sewer service to the Properties. Finally, the County argues, for multiple reasons, that all claims against Leggett should be dismissed.

Plaintiffs assert that summary judgment should be granted in their favor on the RLUIPA Substantial Burden Claim because they had a reasonable expectation that Canaan could obtain approval to build its 2,000-seat church where churches are a permitted use in the RC zone, the lack of that approval has severely burdened Canaan's religious exercise, and the County cannot establish that its actions satisfy strict scrutiny in that they furthered a compelling governmental interest and were the least restrictive means to achieve that interest.  Plaintiffs argue for summary judgment on their RLUIPA Unreasonable Limits Claim by challenging ZTA 12-13 and the WSCCR denials as imposing unreasonable limits on religious assemblies.  Plaintiffs assert that they prevail on the RLUIPA Equal Terms Claim, as well as the Equal Protection Claim, based on the allegedly more favorable, disparate treatment given to the Glenstone Museum.  As for the Free Exercise Claim, Plaintiffs assert that both the BCNPA and ZTA 12-13 are not neutral or generally applicable, and that as a result the County's actions must but cannot satisfy strict scrutiny.

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248).  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.      Standing

The County asserts that the Landowner Plaintiffs lack standing to pursue the RLUIPA Claims and the Free Exercise Claim.  As to the RLUIPA Claims, the County asserts that the relevant provisions do not apply to property owners who are not religious institutions.  As to the Free Exercise Claim, the County argues that the Landowner Plaintiffs lack standing because they cannot assert that their own First Amendment rights have been burdened, and their inability to sell the Properties is not redressable through a free exercise claim.  The Landowner Plaintiffs oppose the Motion only as to the RLUIPA Claims, arguing that they meet the requirements of

constitutional standing because any favorable outcome on their RLUIPA Claims will redress their injury.

Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To invoke this power, a litigant must have standing. *Hollingsworth v. Perry,* 570 U.S. 693, 704 (2013). A plaintiff establishes standing by demonstrating (1) a "concrete and particularized" injury that is "actual or imminent," (2) "fairly traceable to the challenged conduct," (3) and "likely to be redressed by a favorable judicial decision." *Id.; Covenant Media of S.C., LLC v. City of N. Charleston,* 493 F.3d 421, 428 (4th Cir. 2007). Standing must be demonstrated for each claim. *Bostic v. Schaefer,* 760 F.3d 352, 370 (4th Cir. 2014). The presence of one plaintiff with standing renders a claim justiciable. *Id.* at 370–71. Significantly, RLUIPA imposes no additional standing requirements. 42 U.S.C. § 2000cc-2(a) (stating that standing under RLUIPA "shall be governed by the general rules of standing under Article III of the Constitution").

Turning first to the Free Exercise Claim, the County relies on *Mount Elliott Cemetery Association v. City of Troy*, 171 F.3d 398 (6th Cir. 1999), a case challenging a city's refusal to rezone an area to allow for a Catholic cemetery, in which the court held that the cemetery owner lacked standing to pursue a free exercise claim because it did not allege any infringement on its own religious beliefs and was not itself a religious organization or affiliated with one. *Id.* at 403. The Landowner Plaintiffs offer no contrary authority and do not otherwise oppose the County's argument on this point. The Landowner Plaintiffs must therefore be construed as conceding the County's point. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (holding that a "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997)

(finding that the plaintiff had abandoned a claim "by failing to address that claim in her opposition to [the defendant's] motion for summary judgment, or to offer clarification in response to [the defendant's] reply brief").  Even if the Landowner Plaintiffs did have standing, their claim would fail for the reasons set forth below.  *See infra* part VIII.

As for the RLUIPA claims, the County does not seriously contest that as a matter of Article III standing, the Landowner Plaintiffs have plausibly asserted that the County's denial of the Canaan WSCCRs in alleged violation of RLUIPA has caused a concrete injury to them, specifically, their inability to sell the Properties; that it is traceable to the County's action; and that a favorable outcome would redress that injury because they could then sell the Properties to Canaan for financial gain.  No other requirements must be met to establish standing.  *See* 42 U.S.C. § 2000cc-2(a).

The County's argument is thus limited to the claim that Landowner Plaintiffs lack standing because RLUIPA claims may be brought only by religious institutions, not property owners.  The RLUIPA substantial burden provision states that "No government shall impose a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person."  42 U.S.C. § 2000cc(a)(1).  Based on this language, which does not limit the class of potential plaintiffs, several courts have held that "a plaintiff is not required to be engaged in religious exercise to bring a claim under RLUIPA."  *Andon, LLC v. City of Newport News*, 63 F. Supp. 3d 630, 637 (E.D. Va. 2014) (holding that the developer plaintiff had standing to bring a RLUIPA substantial burden claim), *aff'd,* 813 F.3d 510 (4th Cir. 2016); *Dixon v. Town of Coats*, No. 5:08-CV-489-BR, 2010 WL 2347506, at *5 (E.D.N.C. June 9, 2010) (same).  As for the RLUIPA equal terms and unreasonable limits claims, the statutory language likewise does not limit causes of action to those engaged in religious exercise.  The RLUIPA equal terms provision states only that,

22

"[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).  The RLUIPA unreasonable limits provision states only that, "[n]o government shall impose or implement a land use regulation that … unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(B). Nevertheless, several courts have found that one element of an equal terms claim is that the plaintiff is a religious assembly or institution.  *See, e.g.*, *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307 (11th Cir. 2006); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 270 (3d Cir. 2007).  This Court need not decide whether being a religious institution is an element of this cause of action because the question is not one of Article III standing, but of whether the Landowner Plaintiffs can state a plausible claim for a relief.  *See, e.g.*, *Bey v. City of Tampa Code Enf't*, 607 F. App'x 892, 898 (11th Cir. 2015) (noting that the district court erroneously conflated the standing requirements with the merits of the plaintiff's claim);  *Dixon*, 2010 WL 2347506, at *4–*6 (dismissing a RLUIPA equal terms claim by a non-religious property owner because one of the elements of such a claim is being a religious institution, not based on Article III standing).  Where Article III standing is satisfied and RLUIPA specifically states that there are no other requirements to establishing standing, the Court will not dismiss the Landowner Plaintiffs' RLUIPA claims for lack of standing.  *See* 42 U.S.C. § 2000cc-2(a).

### III.    New Hope Claims

The County asserts that any claims stemming from the New Hope WSCCRs are barred by the statute of limitations.  Because RLUIPA was enacted in 2000, 114 Stat. 803 (2000), RLUIPA claims are subject to a four-year statute of limitations.  *See* 28 U.S.C. § 1658(a) (2018) (setting a

four-year statute of limitation for civil actions arising from federal statutes enacted after the Judicial Improvements Act of 1990, ch. 111, § 1658, 104 Stat. 5089).  Plaintiffs' constitutional claims proceed pursuant to 42 U.S.C. § 1983, which does not have its own statute of limitations, so courts must import a statute of limitations from the most analogous state law cause of action. *Owens v. Balt. City State's Atty's Off.,* 767 F.3d 379, 388 (4th Cir. 2014).  All of the events in this case occurred in Maryland.  Consequently, Maryland's three-year statute of limitations for civil actions, Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2013), applies to these claims.  *Owens,* 767 F.3d at 388.  Although state law provides the limitations period for these claims, federal law controls when these federal claims accrue.  *Nasim v. Warden, Md. House of Corr.,* 64 F.3d 951, 955 (4th Cir. 1995).  Under federal law, a "cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—*e.g.,* by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim."  *Id.*

Applying this standard here, the Court concludes that all of the New Hope claims are time-barred.  Although the New Hope WSCCR was deferred in July 2011 and not denied outright, the undisputed facts establish that by November 2011, New Hope's contract with the Landowner Plaintiffs for the purchase of the Properties had been terminated and New Hope had received a refund of its deposit, and that in February 2012, New Hope expressly withdrew its participation in New Hope WSCCR.  Thus, no later than February 2012, the Landowner Plaintiffs were on notice that as a result of the County's actions, there was no further prospect for New Hope to obtain the Properties for its proposed church use.  Any constitutional or statutory claims relating to the County's denial of New Hope's ability to build a religious facility on the Properties were therefore

24

ripe as of that withdrawal and were time-barred no later than February 2016, well before this lawsuit was filed in November 2016.

The Landowner Plaintiffs, however, assert that the statute of limitations period should be tolled by either the discovery rule or the continuing violation doctrine. *See Frederick Road v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000) ("The discovery rule tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury."); *MacBride v. Pishvaian*, 937 A.2d 233, 240 (Md. 2007) (stating that the continuing violation theory provides that "violations that are continuing in nature are not barred by the statute of limitations merely because one or more of them occurred earlier in time," and that acts qualifying under this theory are "continuing unlawful acts, for [example] a monthly over-charge of rent, not merely the continuing effects of a single earlier act"). Beyond the fact that these doctrines are based on state law, which is not applicable here, they are unsupported by the facts. The Landowner Plaintiffs were well aware by October 2011 that their contract with Canaan had been terminated, and in fact they had returned the deposit no later than November 2011. Even without explicit evidence that they were informed of the February 2012 withdrawal of the New Hope WSCCR, their actions establish that they were aware of it because by June 2012—still more than four years before the present action was filed—the Landowner Plaintiffs were in the thick of a multi-pronged campaign to get the Properties rezoned for townhouses, including Nagy's June 21, 2012 letter to the Planning Board referencing the failure of the New Hope WSCCR and advocating not for New Hope, but for the rezoning for residential use. Once the Landowner Plaintiffs were presenting to the Planning Board and the Council proposals for a use and zoning of the Properties different from those sought on behalf of New Hope, the Landowner Plaintiffs knew or was on notice that the New Hope WSCCR was a dead

letter, and thus that any cause of action stemming from it had accrued.  Finally, where the Canaan WSCCRs related to an entirely different project, and were subject to a different master plan, the BCNP, there is no fair argument that there were any continuing violations.  The County's Motion will be granted as to the New Hope claims.

## IV.    RLUIPA Substantial Burden Claim

Plaintiffs and the County each argue that they are entitled to summary judgment on the RLUIPA Substantial Burden claim.  The County primarily asserts that it should prevail because the undisputed facts establish that Plaintiffs did not have a reasonable expectation that sewer service would be approved for the Properties because the BNCP effectively barred such sewer service and Plaintiffs were aware that approval was highly unlikely before Canaan entered into the 2013 Contracts.  Plaintiffs, in turn, assert that they are entitled to summary judgment because they had a reasonable expectation based on the fact that churches are permitted "by right" in the zoning area applicable to the Properties, the determination whether to grant a WSCCR to allow the extension of public sewer to the Properties was discretionary, and the County's denial of the WSCCR effectively barred the construction of a church that Canaan needed to meet its religious needs.

The RLUIPA substantial burden provision states that:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and
(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  This provision is applicable when, in relevant part, the "substantial burden" arises from "the implementation of land use regulations or a system of land use

regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved."  42 U.S.C. § 2000cc(a)(2)(C).

To succeed on a RLUIPA substantial burden claim, a plaintiff must show "that a government's imposition of a regulation regarding land use, or application of such a regulation, caused a hardship that substantially affected the plaintiff's right of religious exercise."  *Andon, LLC v. City of Newport News*, 813 F.3d 510, 514 (4th Cir. 2016).  When a religious organization acquires property expecting to use it for a religious purpose but is prevented from doing so by the application of a land use regulation, the determination whether there has been the imposition of a substantial burden in violation of RLUIPA involves consideration of two questions:  (1) whether the government or the religious organization is responsible for the impediment; and (2) whether the impediment to the organization's religious practice is substantial.  *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty.*, 915 F.3d 256, 261 (4th Cir. 2019).

On the first of these questions, the United States Court of Appeals for the Fourth Circuit has adopted a "reasonable expectation" standard, under which the court considers "[w]hether the organization had a reasonable expectation of religious land use" or "whether the burden faced by the religious organization is self-imposed." *Jesus Christ is the Answer*, 915 F.3d at 261; *Andon*, 813 F.3d at 515.  Courts consider the organization's expectations at the time of purchase, because "[w]hen a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden" in violation of RLUIPA.  *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 557 (4th Cir. 2013).  As for whether an impediment is "substantial," that condition is met when "use of the property would serve an unmet religious need, the restriction on religious use is

absolute rather than conditional, and the organization must acquire a different property as a result." *Jesus Christ is the Answer*, 915 F.3d at 261.

The Fourth Circuit has addressed RLUIPA substantial burden claims in several recent cases, with different results.  In *Bethel*, a Christian church purchased property in Montgomery County, Maryland in 2004 with the intention of building a 3,000 seat church.  *Bethel*, 706 F.3d at 553.  At that time, the property was in the rural density transfer zone, which permitted churches, but the property was not served by public water and sewer.  *Id.* at 552–53.  When the church, Bethel, filed a WSCCR, the County denied it and at the same time approved an amendment to the Water & Sewer Plan that prohibited public water and sewer service to PIFs in the rural density transfer zone.  *Id.*  The County then adopted an amendment to the Water & Sewer Plan that restricted the size of new private well and septic systems in that same zone.  *Id.*  When Bethel abandoned its request for public water and sewer and instead sought approval for a private well and septic system for a smaller, 800-seat church designed to meet the new requirement, the County adopted a zoning amendment that effectively barred Bethel's construction of the smaller church. *Id.* at 554.  After Bethel filed suit asserting a RLUIPA substantial burden claim and other causes of action, the Fourth Circuit reversed the district court's grant of summary judgment to the County on that claim because Bethel had established a genuine dispute of material fact whether it had a reasonable expectation that it could use the property for its proposed religious use.  *Id.* at 558.

In *Andon*, a religious organization purchased a parcel of land zoned for commercial use that could be used for a place of worship if it met four conditions, including a setback requirement. *Andon*, 813 F.3d at 512.  When the landowner applied for a zoning variance that would have allowed the religious use, the city denied it on the grounds that the requirements to receive a variance were not satisfied where the property could be used for other purposes without a variance

and failing to grant the variance would not impose an undue hardship on the property not shared generally by other properties. *Id.* at 513. In upholding the dismissal of the RLUIPA substantial burden claim, the court found that unlike in *Bethel*, the plaintiffs "never had a reasonable expectation" that the property could be used as a church because they were aware that such a use required a variance from the setback requirement, and a city official had told Andon before the variance application that it would not be approved, so the plaintiffs had "assumed the risk of an unfavorable decision" as reflected in their decision to include a contingency provision in the lease. *Id.* at 515. The court concluded that "[b]ecause the plaintiffs knowingly entered into a contingent lease agreement for a non-conforming property, the alleged burdens they sustained were not imposed" by the denial of the variance, "but were self-imposed hardships" which will not support a RLUIPA substantial burden claim. *Id.* at 515.

Most recently, in *Jesus Christ is the Answer*, a church purchased property located in a residential zone where churches are a permitted use under certain conditions, including a 75-foot setback requirement, a 50-foot landscaped buffer requirement that new churches needed to maintain only "to the extent possible," and a site plan that would be "compatible with the character and general welfare of the surrounding residential premises." *Jesus Christ is the Answer*, 915 F.3d at 259. The pastor of the church had been expressly advised by her realtor before purchase that the proposed religious use "was a permitted use on the Property." *Id.* After buying the parcel, the church made improvements to both the building and the parking lot and petitioned for a variance, seeking a setback and buffer of zero feet and complete relief from all zoning requirements. *Id.* That petition was ultimately denied, but while it was pending, the church filed a second one, seeking a setback of 55–73 feet while complying with all other requirements, that was dismissed on the grounds of *res judicata* and collateral estoppel. *Id.* at 260. The court reversed the dismissal

of the church's RLUIPA substantial burden claim because the church had a "reasonable expectation of using the Property as a church" based on the realtor's advice which "was of course correct" where churches were "'permitted as of right,' provided that their site plans comply 'to the extent possible'" with applicable requirements and those requirements were "broadly and permissibly phrased conditions." *Id.* at 261 (citation omitted).

### A.      Reasonable Expectation

Plaintiffs assert that they had a reasonable expectation of religious land use because churches are a permitted use in the RC zone, and the PIF Policy permits category changes to sewer policies for churches.   The County asserts that Plaintiffs lacked a reasonable expectation of religious land use because (1) the BCNP imposed a restriction on providing public sewer service to the Properties that rendered approval of the Canaan WSCCR either unlawful or highly unlikely to succeed; and (2) the Landowner Plaintiffs' prior history of attempting and failing to secure approval for sewer extensions to the Property made any expectation of approval of the Canaan WSCCRs unreasonable. The County further argues that Canaan, too, was aware of the unlikelihood of approval based on conversations in which Canaan learned from County officials, before Canaan entered into the contract at issue, that a WSCCR would need to be approved and would likely be denied.   Upon review of the record, the Court finds that the uncontested facts firmly establish that there was no reasonable expectation that Plaintiffs could use the Properties for the proposed religious use.

### 1.      The Master Plan

First, the applicable land use regulatory scheme effectively prevented the extension of public sewer to the Properties.   Although churches are permitted "by right" in the RC zone, and a church is a PIF that generally may seek a category change under the Water & Sewer Plan, the

County is correct that the BCNP, as a master plan, is also part of the applicable land use regulatory regime. Maryland law requires all counties to enact, adopt, amend, and execute master plans. Md. Code Ann., Land Use § 3-101(a) (West 2012), *see id.* § 1-101(i) (defining "local jurisdiction" as a county or municipal corporation). In general, master plans are "advisory in nature" and lack the force of law absent statutes or local ordinances linking planning and zoning, which can elevate the plan to "the level of a true regulatory device." *HNS Dev. v. Balt. Cty.*, 42 A.3d 12, 25 (Md. 2012) (quoting *Mayor & City Council of Rockville v. Rylyns*, 814 A.2d 469, 478 (Md. 2002)). Maryland law, however, provides that once a master plan is in place, the county must "ensure the implementation of the visions, the development regulations element, and the sensitive areas element of the plan," including by adopting zoning laws and local laws governing planned development, subdivisions, and other land use provisions, that are "consistent with the comprehensive plan." Md. Code Ann., Land Use § 1-417(a), (b). Prior to 2009, there was uncertainty whether Maryland statutory requirements that local government land use actions be "consistent" with master plans had regulatory effect. *Friends of Frederick Cty. v. New Market*, 120 A.3d 769, 777 (Md. Ct. Spec. App. 2015). However, after the Court of Appeals of Maryland, in *Trail v. Terrapin Run*, 943 A.2d 1192 (Md. 2008), held that the then-existing statutory consistency requirements were not "a true regulatory device," the Maryland General Assembly, in its next legislative session, passed the "Smart, Green, and Growing—Smart and Sustainable Growth Act of 2009," which is now codified, in part, as Title 1, Subtitle 3 of the Land Use Article, specifically to overturn the holding of *Trail. See Friends of Frederick Cty.*, 120 A.3d at 777-78 (citing *Trail*, 943 A.2d at 1221). Based on that Act, Maryland law now provides that when certain enumerated statutes require actions to be "consistent with" or have "consistency" with a master plan, such actions must "further, and not be contrary to," among other things, the policies,

31

development patterns, land uses, and densities or intensities stated in the master plan. Md. Code Ann., Land Use § 1-303 (stating that this consistency definition applies to statutes listed under Md. Code Ann., Land Use § 1-302). Accordingly, at least as of 2009, as to "significant aspects of local government land use regulation," master plans are now "true regulatory devices." *Friends of Frederick Cty.*, 120 A.3d at 778 (interpreting sections 1-302 and 1-303 and reaching this conclusion in particular as to "a special exception application" under the land use laws). The contrary case law relied upon by Plaintiffs was decided before the 2009 statutory change. *See, e.g.*, *Richmarr Holly Hills, Inc. v. Am. PCS, L.P.*, 701 A.2d 879, 895 (Md. Ct. Spec. App. 1997).

Among the statutes to which this consistency definition applies are the provisions of the Environmental Article relating to water and sewer plans. Md. Code Ann, Land Use § 1-302 (listing among the applicable statutes Md. Code Ann., Envir. §§ 9-505(a)(1), 9-506(a)(1), 9-507(b)(2) (West 2017)). In turn, these provisions require county water and sewer plans to "[p]rovide for the orderly expansion and extension" of sewer systems "in a manner consistent with all county and local comprehensive plans," Md. Code Ann., Envir. § 9-505(a)(1) (West 2017), and that any "proposed revision or amendment" to a water and sewer plan must be reviewed for "the consistency of the proposal with the local master plan" before it is approved by the Maryland Department of the Environment, *id.* § 9-507(b). A WSCCR, also referred to as a "service area category amendment," J.R. 430, is a form of amendment of a water and sewer plan. *See* J.R. 435-438 (including category change requests within the section of the Water & Sewer Plan relating to amending the plan). Accordingly, the consistency requirement in Maryland law gives the BCNP regulatory effect over such determinations. *See Friends of Frederick Cty.*, 120 A.3d at 778. Indeed, as noted by Soukup, the County reviews WSCCRs with the understanding that their ability to approve them is restricted by the requirement of consistency with master plans, particularly with

specific recommendations in such plans, and the Maryland Department of the Environment has rejected WSCCRs that are inconsistent with master plans.  J.R. 3554-55.

Although a county still may make its own judgment on whether a WSCCR is "consistent" with the master plan, and in some instances there could be reasonably differing views on that question, here, the BCNP specifically provides that in the area of the Rural Edge Neighborhood located in the Patuxent Watershed, "no public sewer should be permitted for any use."  J.R. 278. On its own terms, this recommendation leaves little room for debate because many of its key terms are absolute:  "no" sewers for "any" use.  Though this provision uses the term "should," this narrow opening is of limited value in light of Maryland's statutory requirement that counties must act "consistent" with a master plan, defined as taking actions that "will further, and not be contrary to," the plan's terms.  Md. Code Ann., Land Use § 1-303.  Thus, the County had, at most, very limited discretion to approve the Canaan WSCCRs.

Although Plaintiffs counter that the RC zone permits churches "by right," and that the WSCCR did not directly run afoul of the PIF Policy, such points do not expand the likelihood of approval.  The zoning law simply defines the default for what is permissible or not in a particular zone.  *See, e.g., People's Counsel for Balt. Cty. v. Surina*, 929 A.2d 899, 915 (Md. 2007) ("While zoning laws define the uses that are permitted in a particular zoning district, *i.e.,* the R.C. 5 and R.C. 2 zones, subdivision regulations inform how, when, and under what circumstances a particular tract may be developed").  The Water & Sewer Plan, while generally allowing PIFs to submit WSCCRs and not itself explicitly barring an exception for the relevant land area, does not entitle a PIF to approval based only on its status and simply permits, but does not require, the County to grant such WSCCRs.  *See* J.R. 430 (stating that PIF service category change amendments "may be approved" if certain conditions are met).  Moreover, by its own terms, the

Water & Sewer Plan provides that "water and sewer decisions should follow and implement the land use development guidelines established in the County's General Plan and local area master plans." J.R. 425.  Where the granting of the Canaan WSCCR would run contrary not only to the BCNP's definitive statement that there should be no sewer extensions into the Patuxent Watershed/Rural Edge Neighborhood overlap, but also to the Water & Sewer Plan's guidance that sewer decisions should follow the terms of master plans, the Court concludes that the County's ability to approve the Canaan WSCCRs was so limited that Plaintiffs could not have reasonably expected to successfully secure the necessary public sewer service.

Plaintiffs' claim that the County has granted WSCCRs to PIFs even when they were arguably inconsistent with a master plan does not alter this conclusion.  Although a master plan is regulatory in nature, the requirement that a county act *consistent* with a master plan generally allows for some interpretation.  *Cf. Sargent v. Holland*, 114 F.3d 33, 36 (4th Cir. 1997) (finding that ERISA plan administrators' interpretation of the term "mine accident" was not an abuse of discretion and was "in fact the interpretation most consistent with the purposes of the Plan").  As noted by Soukup, however, there is a difference between a master plan's general recommendation that the provision of public sewer be consistent with the policies of the Water & Sewer Plan, which affords greater discretion to the County, and a specific recommendation such as the BCNP's restrictive statement "no public sewer … for any use," J.R. 278, effectively prohibiting sewer extensions into the relevant land area. J.R. 3551-52.  The Potomac Subregion Master Plan, at issue with the Glenstone Museum WSCCR, has such a general recommendation, stating that sewer service should be provided "generally in conformance Water and Sewer Plan service policies" and while "generally exclud[ing]" sewer from certain areas, also endorsed certain "limited approvals." Potomac Subregion Master Plan at 23. The Sandy Spring/Ashton Master Plan, applicable to the

Shri Mangal WSCCR referenced by Plaintiffs, has decidedly more broad and permissive language, including recommending that requests for public water and sewer be assessed using "flexibility principles."   Sandy Spring/Ashton Master Plan at 80.   While such language may support an expectation of possible approval, the BCNP's language does not.

### 2.      WSCCR History

Second, beyond the restrictive provision of the BCNP, the unreasonableness of expecting an extension of public sewer to the Properties was well known to Plaintiffs.   The Landowner Plaintiffs filed the Canaan WSCCRs in June 2013.   The BCNP, with its recommendation of no public sewer for any use in the area of Rural Edge Neighborhood that overlaps with the Patuxent Watershed, an overlap where the Properties are located, was adopted in December 2012.   The Landowner Plaintiffs were well aware of this recommendation because they had been deeply involved in the BCNP process.   First, they engaged in a concerted effort to have the Properties included within the sweep of the BCNP, including requesting inclusion at a 2011 public hearing before the Council relating to the pending WSCCRs.   Second, at a July 2012 Council meeting and as part of a campaign during 2012 through the Committee to Save Burtonsville, they advocated to have the BCNP rezone the Properties as RT-6 in order to advance their townhouse project and other residential development of the Properties.   Finally, the Landowner Plaintiffs engaged in a last-ditch effort to prevent the adoption of the BCNP's ultimate recommendations, including having Nagy argue at a Council public hearing on September 20, 2012 that the BCNP provisions, including the preclusion of extending public sewer "for any use," rendered the Properties "virtually worthless."   J.R. 1408.

Further, the adoption of the BCNP was the last in a long line of County decisions that put the Landowner Plaintiffs on clear notice that any expectation that public sewer would be provided

to the area including the Properties was unreasonable.  Prior to the BCNP, various Landowner Plaintiffs or their predecessors had filed at least seven prior WSCCRs, relating to both religious and non-religious development projects, each of which had been denied or deferred, several because of the same environmental concerns that led to the public sewer provision in the BCNP. These WSCCRs included a 1997 WSCCR by Burtonsville Associates to support a senior housing development; a 2002 WSCCR to support a residential development and a dog kennel; two 2003 WSCCRs filed by Burtonsville Associates, one to support a senior housing project and one for a church or other special exception use; a 2007 WSCCR by Burtonsville Associates for a senior housing project; a 2009 WSCCR by Burtonsville Crossing for a for-profit senior housing development; and a 2009 WSCCR by Burtonsville Associates for New Hope or another place of worship.  The difficulty of securing approval of a sewer category change request for development on the Properties was thus a well-known, long-standing thorn in the side of the Landowner Plaintiffs.  Indeed, it was the basis for Burtonsville Crossing's multiple, successful tax appeals, in which Ms. Norris bemoaned the fact that, due to the environmental restrictions of the PMA in which the Properties were located, it was "impossible to build" on the BC Parcel.  J.R. 977.

While Canaan may not have known every aspect of the long, tortured history of the Landowner Plaintiffs' failed development efforts, it certainly knew the salient details before first contracting to purchase the Properties.  Coombe, Canaan's diligent real estate agent, had not relied on Mr. Norris's loud promises that approval was guaranteed because churches were a "by right" use in the RC zone and instead conducted her own due diligence, including speaking with Soukup, who expressed his "huge doubts" that Canaan could secure a PIF category change request for sewer in light of the provisions of the BCNP.  J.R. 1886.  Significantly, Coombe told Pastor Melara in a February 24, 2013 email that she did not "necessarily believe" Mr. Norris's claims that the

36

Properties could receive water and sewer and that the County had provided "far . . . different information." J.R. 1909.  Canaan's knowledge of the likelihood that they it would not get approval for public sewer was reflected in the water and sewer contingency provisions of each of the contracts with the Landowner Plaintiffs, executed in June or July 2013.  Where the relevant language of the BCNP is considered alongside the historical course of conduct relating to WSCCRs for the Properties, the Court finds that the Landowner Plaintiffs and Canaan both were on notice that the Properties were situated in an area marked for particular environmental protection and that there was no reasonable expectation that the Canaan WSCCRs would be granted.

This conclusion is consistent with the Fourth Circuit precedent on RLUIPA substantial burden claims, in particular *Andon*, which largely governs the present case.  As in *Andon*, Plaintiffs sought to acquire a property for which religious use was possible but required local government approval of a land use change:  in *Andon*, the plaintiffs required a variance to excuse compliance with a setback requirement, while here, Plaintiffs required a WSCCR to gain access to public sewer.  *See Andon*, 813 F.3d at 512–13.   In both cases, the plaintiffs met with County officials in advance of entering into a contract and were told that the required approval was not likely to be forthcoming but nevertheless entered into a contract to purchase the property with a contingency provision conditioning the transaction on approval of the required change.  *Id.*  When litigation is anticipated and contracted for, it is difficult to conclude that Plaintiffs—even if they subjectively believed they should have the right to build the proposed church—reasonably expected that they would be able to do so.  *See id.* at 515 (considering the contingent lease agreement as a factor in establishing no reasonable expectation); *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1945 (2017) ("The reasonable expectations of an acquirer of land must acknowledge legitimate restrictions

affecting his or her subsequent use and dispensation of the property."). Thus, Plaintiffs "assumed the risk of an unfavorable decision," and their failure to secure the required category change request was a "self-imposed hardship." *Andon*, 813 F. 3d at 515. As noted by the Fourth Circuit, to find that the denial imposed a substantial burden on their religious exercise would "effectively be granting an automatic exemption to religious organizations from generally applicable land regulations." *Id.* at 516.

Plaintiffs attempt to distinguish *Andon* by noting that the property at issue was in a zone that did not permit churches as of right and required a variance, not a WSCCR. *Id.* at 512. If this fact alone were dispositive, however, the *Andon* court would have had no need to consider other facts, such as the contract provisions and the discussions with zoning board members, in evaluating whether there was a reasonable expectation. *Id.* The court in fact applied a more flexible test involving consideration of all the relevant circumstances, an approach later adopted by the Fourth Circuit in *Jesus Christ is the Answer*. 915 F.3d at 261. Significantly, in *Andon*, the plaintiffs were not doomed by a broad prohibition on churches because the zoning classification did not foreclose the plaintiffs' proposed use, and the potential for a variance rendered it legally possible, subject to the decision of the city government. *Id.* at 512-13. The zoning ordinance expressly provided that houses of worship could be built if they satisfied four delineated conditions, including a setback requirement. *Andon*, 813 F. 3d at 512. As here, the applicable regulations thus contemplated and laid out a path to the result that the *Andon* plaintiffs hoped to achieve, but approval of that requested change was insufficiently likely to support a reasonable expectation. In this light, *Andon* starkly parallels the facts here: plaintiffs in both cases were well aware that the governing regulations would likely not permit the use or construction of the specific buildings for which they sought approval.

Notably, *Andon* distinguished *Bethel*, cited favorably by Plaintiffs and which involved a WSCCR, not based on any distinction between the applicable baseline zoning classifications, or any distinctions between the likelihood of securing a variance or a WSCCR in general, but on the grounds that in *Bethel*, there was "a pre-existing expectation that the plaintiffs would be able to use the property for a church facility," which was altered when the County adopted two land use regulations *after* the plaintiff had purchased the property that effectively thwarted the proposal. *Andon*, 813 F.3d at 514–15. *Bethel* is likewise markedly different from the present case. In *Bethel*, before the plaintiffs purchased the property, the County had considered changes to the PIF Policy that would have effectively barred the extension of sewer access to the relevant zone, but made such a change only after Bethel sought its WSCCR. *Bethel*, 706 F.3d at 553-54. Then, after the church modified its proposal to seek a smaller church without public sewer and within recently adopted limits for a private well and septic system, the County adopted a new zoning amendment that effectively barred that use, too. *Id.* Here, by contrast, before Canaan entered into a contract to purchase the Properties, the County had already adopted the BCNP, which effectively prevented public sewer in the relevant area, following a long history of failing to approve WSCCRs for a wide range of uses on the Properties, and it adopted no new provisions during the consideration of the WSCCRs that further restricted the use of the land.

As for *Jesus Christ is the Answer*, there, churches were permitted by right in the relevant zone if certain conditions were met, but the plaintiff could reasonably have expected that it could have met them where the conditions were "broadly and permissibly phrased," in that they required compliance with certain parking, setback, and buffer zone distances only "to the extent possible" and required only that the plan be otherwise "compatible with the character and general welfare of the surrounding residential premises." *Id.* at 259, 261. Moreover, after the county government

rejected a first proposal that failed to meet those requirements, it inexplicably dismissed the church's second proposal that largely met those conditions. *Id.* at 261–62. Here, the restriction on public sewer in the BCNP was very focused and unforgiving, the history of denying WSCCRs for the Properties was long and effectively absolute, and there was no denial of a proposal that even arguably satisfied that limitation.

Ultimately, Plaintiffs' argument as to why their expectation of being able to build on the Properties a 2,000-seat church with public sewer was reasonable amounts to a reiteration of Tom Norris's brazen assertion that simply because Canaan was a church, "[t]he County cannot delay or hinder development in any way." J.R. 1887–88. This is simply incorrect. RLUIPA was not intended "to undermine the legitimate role of local governments in enacting and implementing land use regulations," nor is it an "automatic exemption to religious organizations from generally applicable land use regulations." *Andon*, 813 F.3d at 516. To find otherwise here would "usurp the role of local government in zoning matters . . . and impermissibly would favor religious uses over secular uses," *id.*, which is precisely what the Landowner Plaintiffs intended when their townhouse development project failed and they went to their "Plan B" of finding a church to purchase the land under the misguided notion that it would be entitled to special, rather than equal, treatment. J.R. 1883. Where Plaintiffs contracted for the sale and purchase of the Properties well aware of all the restrictions applicable to them, no land use regulations changed after the purchase such that Canaan was deprived of an anticipated use, and they fully anticipated having to litigate the question whether such restrictions could be applied to them as reflected in their contract contingencies, the Court finds that Plaintiffs had no reasonable expectation of religious use for the Properties. *See Andon*, 813 F.3d at 516.

### B.       Substantial Burden

As discussed above, on a RLUIPA substantial burden claim, an impediment is generally substantial when "use of the property would serve an unmet religious need, the restriction on religious use is absolute rather than conditional, and the organization must acquire a different property as a result." *Jesus Christ is the Answer*, 915 F.3d at 261.  Here, there is no dispute that Canaan has an unmet religious need.  It has a congregation of approximately 2,000 people, which it cannot feasibly serve in its present 250-seat church.  In order to minister to its congregation, Canaan must hold multiple worship services, a partial solution that leaves unresolved the fact that Canaan must, as a result of its limited space, curtail other church-related functions that it sees as integral to its mission.  Nor is there a dispute that denial of the Canaan WSCCRs has rendered Canaan unable to build its proposed 2,000 seat church on the Properties and that it will need a different property to construct such a facility.

The parties dispute whether the restriction on religious use was absolute or conditional. The Court agrees with the County that there was no absolute restriction on building a church on the Properties.  The denial of the Canaan WSCCRs was a denial only of a PIF category change request to receive public sewer service.  As the County notes, there is no restriction that would prevent Canaan from building an 800-seat, septic-serviced church on the Properties.  Indeed, in prior discussions with New Hope, County officials informed the New Hope pastor that it would consider a septic-serviced church of that size.  This case is therefore unlike *Bethel*, in which the County had rejected not only the original proposal of a 3,000 seat church with public sewer but then later rejected an alternative proposal for a 800-seat church with septic service, and thus "completely prevent[ed] Bethel from building any church on its property."  *Bethel*, 706 F.3d at 558.  Although Plaintiffs argue that the County never offered it the option of a smaller church, the

record provides no evidence that Canaan expressed an interest in a smaller church or one that used septic service rather than public sewer.  The County did not have an affirmative obligation to reimagine Canaan's proposed church, including by conducting studies to determine the viability of an entirely different waste disposal system, and propose different ways to meet Canaan's religious needs.   Although Plaintiffs are correct that the County would have the burden to show that its application of land use regulations was narrowly tailored to serve a compelling state interest, that burden arises only after a plaintiff has first carried its burden of establishing that application of those regulations imposed a substantial burden.  *Livingston Christian Schs. v. Genoa Charter Twnshp.*, 858 F.3d 996, 1005 (6th Cir. 2017) (stating that the narrowly tailored inquiry should be undertaken by a court "only after finding that a substantial burden exists").

Though the facts on whether the burden was actually substantial are therefore mixed, the Court need not resolve this issue because the lack of a reasonable expectation is alone sufficient to defeat Plaintiffs' RLUIPA Substantial Burden claim.  *See Andon*, 813 F.3d at 516 (affirming the dismissal of a substantial burden claim based only on the finding that there was no reasonable expectation).   In *Andon*, the court notably found that in the absence of a reasonable expectation, the fact that the plaintiffs were unable to find another property that met its needs was not sufficient to establish a substantial burden.  *Id.* at 516.  Accordingly, the Court need not resolve whether the nature of the restriction rendered the burden on Canaan substantial within the meaning of RLUIPA. Where there was no reasonable expectation, the Court also need not address whether there was a compelling state interest for the County's denial of the Canaan WSCCRs.  *Id.* (affirming the dismissal of the substantial burden claim based solely on reasonable expectation, without addressing whether there was a compelling state interest).  The County's Motion will be granted as to the RLUIPA Substantial Burden Claim.

42

V.     **RLUIPA Unreasonable Limits Claim**

Beyond the RLUIPA Substantial Burden Claim, Plaintiffs also assert a violation of the RLUIPA unreasonable limits provision, which states that "No government shall impose or implement a land use regulation that … unreasonably limits religious assemblies, institutions, or structures within a jurisdiction."   42 U.S.C.  §  2000cc(b)(3)(B).   This provision "prevents government from adopting policies that make it difficult for religious institutions to locate anywhere within the jurisdiction."  *Bethel*, 706 F.3d at 560.

Plaintiffs assert that the adoption of ZTA 12-13 and the denial of the WSCCRs violated this provision because those actions affect only the Properties and prevent a religious institution from being able to use that land.  Although Plaintiffs engage in statutory interpretation efforts aimed at evading the plain meaning of the term "within a jurisdiction," their arguments are foreclosed by *Bethel*.  In *Bethel*, the Fourth Circuit was presented with facts more stark that the ones here:  a zoning ordinance—ZTA 07-07—that prohibited all institutional uses, including religious ones, in the rural density transfer zone.  *Bethel*, 706 F.3d at 560.  Even though that ordinance effectively operated as a total ban within a zoning category across the County, the court found that Bethel's unreasonable limits claim failed as a matter of law because there was no evidence "suggesting that religious organizations are left without a reasonable opportunity to build elsewhere in the County."  *Id.* at 560.  This same reasoning applies here, particularly considering that the WSCCR denials related to a narrow land area within the County, and ZTA-12-13 imposed no absolute restriction on use in general or religious use in particular, but instead only adjusted the cap on impervious surface area.  Where there is no evidence that the County, through the identified actions or otherwise, has impeded religious institutions from locating "anywhere within the

43

jurisdiction," *Bethel*, 706 F.3d at 560, the County's Motion will be granted as to Plaintiffs' RLUIPA Unreasonable Limits Claim.

## VI.    RLUIPA Equal Terms Claim

Plaintiffs assert that the County also violated a third part of RLUIPA, the equal terms provision, which makes it unlawful for a government to "impose or implement a land use regulation in a manner that treats a religious assembly on less than equal terms with a nonreligious assembly or institution."   42 U.S.C. § 2000cc(b)(1).   To establish an equal terms violation, a plaintiff must demonstrate four elements:   (1) the plaintiff is a "religious assembly or institution" that is (2) subject to a land use regulation, and (3) the regulation treats the religious assembly on less than equal terms than (4) a "nonreligious assembly or institution."  *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307 (11th Cir. 2006); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 270 (3d Cir. 2007) (adopting the same four elements as in *Primera* and adding the additional element that the non-religious comparator "causes no lesser harm to the interests the regulation seeks to advance"). Here, there is no dispute that the first two elements are satisfied.  As to the remaining two elements, courts have interpreted the RLUIPA equal terms provision to permit three theories of violation: (1) a statute that facially differentiates between religious and nonreligious assemblies; (2) a facially neutral statute that is "gerrymandered" to place a burden solely on religious assemblies or institutions; and (3) a facially neutral statute that is selectively enforced against religious assemblies or institutions.  *Primera Iglesia*, 450 F.3d at 1308.  Plaintiffs proceed only on the third theory and argue that the County violated it by selectively enforcing the Water & Sewer Policy and the BCNP against them.

Because Plaintiffs' selective enforcement theory is an as-applied challenge, they must identify a similarly situated comparator.  *See Elijah Grp., Inc. v. City of Leon Valley, Tex.*, 643 F.3d 419, 422 (5th Cir. 2011) ("In prohibiting the government from treating a religious institution 'on less than *equal* terms with *a nonreligious assembly or institution*,' the [Equal Terms] Clause by its nature requires that the religious institution in question be compared to a nonreligious counterpart, or 'comparator.'") (citation omitted).  Although the Fourth Circuit has not defined the requirements for a valid comparator in a RLUIPA Equal Terms claim, the consensus among circuits faced with similar as-applied challenges, though phrased differently, is "that a comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue*."  *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368-69 (6th Cir. 2018) (requiring a comparator to be similarly situated as to the "legitimate zoning criteria"); *see Centro Familiar Christiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1172–73 (9th Cir. 2011) (requiring that a comparator be similarly situated "as to the regulatory purpose"); *Elijah Grp.*, 632 F.3d at 424 (requiring equal terms as to the "ordinance itself and the criteria by which it treats institutions differently"); *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010) (requiring equal terms as to the "accepted zoning criteria"); *Lighthouse Inst.*, 510 F.3d at 266 (requiring that the comparator be similarly situated "as to the regulatory purpose").  Indeed, Plaintiffs cite some of this same authority in generally agreeing that the relevant standard is that a comparator must be similar situated as to "the relevant zoning purpose or criteria."  Pls.' Reply at 19 & n.30, ECF No. 139.  The Court will therefore apply this standard.

Plaintiffs offer as their comparator the Glenstone Museum ("Glenstone") in Potomac, Maryland, which in 2012 received a WSCCR under the PIF Policy and thus received public sewer to support an expansion of the museum to include a new building.  Plaintiffs argue that Glenstone

is similarly situated in that it was eligible for a category change request under the PIF Policy and, like Canaan, proposed a WSCCR that arguably failed to comply with various parts of its governing master plan.  The County, in response, points to disjunctures between Glenstone and Canaan:  they are in different zones and under different master plans.

Whether Glenstone is an appropriate comparator turns on what regulation is at issue, and the applicable purpose and criteria under that regulation.  *See, e.g.*, *Tree of Life*, 905 F.3d at 368, 371 (considering the applicable ordinance's regulatory purpose and criteria before determining whether the plaintiff's comparator was similarly situated).  Because it was the specific terms of the BCNP, not any particular provision in the Water & Sewer Policy, that controlled the denial of the Canaan WSCCRs, the regulatory purpose at issue is the need "to protect the Patuxent River Watershed" and to manage the development future of the Burtonsville area, as addressed in the BCNP, and the relevant criteria was whether the property was in RC zone and in the land area subject to the no-sewer provision.  J.R. 275.  *See Lighthouse Inst.*, 510 F.3d at 258 (determining whether comparators were similarly situated to the plaintiff in relation to the purposes of a city's "redevelopment plan" adopted to foster a retail "core").  Governed by the Potomac Subregion Master Plan, which covered a different geographic area with different regulatory purposes, and in a residential rather than rural cluster zone, Glenstone has no relationship to the BCNP or its purposes and criteria and thus is not similarly situated to Canaan.  Notably, Plaintiffs have identified no secular entities that sought and received a WSCCR relieving them from the relevant BCNP restriction on public sewer.  Where none of the various secular projects proposed by Landowner Plaintiffs was ever able to secure public sewer under the more permissive prior policies, that failure is unsurprising.

46

Even if Glenstone could be construed as a valid comparator because, at a more general level, both Glenstone and Canaan were subject to the same Water & Sewer Plan and PIF Policy, the record does not support the conclusion that Plaintiffs were subjected to selective enforcement against a religious institution simply because Glenstone received its WSCCR.  The terms of the master plan governing Glenstone were entirely different from those of the BCNP.  The Potomac Subregion Master Plan lacked any of the BNCP's specific language effectively barring public sewer in the relevant area, which, as noted by Soukup, greatly limits the County's ability to grant a WSCCR.  Instead, the Potomac Plan provided only a general recommendation that sewer determinations comply with the Water & Sewer Plan, which as noted Soukup provides the County with more discretion to find a WSCCR consistent with the master plan, *see* J.R. 3551–52, and expressly supported certain "limited approvals" of sewer extensions.  Potomac Subregion Master Plan at 23.  Further, Glenstone also sought a WSCCR in a geographic area outside the Patuxent River Watershed, the protection of which was the specific purpose of the BCNP's public sewer provision.  Thus even if, as Plaintiffs assert, Glenstone's WSCCR was arguably inconsistent with elements of the Potomac Subregion Master Plan, because the BCNP and the Potomac Plan differ in the force of their recommendations, and because Glenstone and Canaan sought to build in environmentally distinct areas of the County, the fact that Glenstone's WSCCR was approved does not establish that the BCNP, the Water & Sewer Plan, or the PIF Policy was selectively enforced against Plaintiffs.  The County's Motion will be granted as to Plaintiffs' RLUIPA Equal Terms Claim.

## VII.   Equal Protection Claim

Plaintiffs' related claim that the denial of the Canaan WSCCRs violated their equal protection rights under the Fourteenth Amendment fails for similar reasons.  Where there is no

evidence of discriminatory intent based on religion, and the land use provisions applied by the County do not classify based on religion, the Court applies rational basis review to Plaintiffs' claim. *See Bethel*, 706 F.3d at 561 (applying rational basis review to a church's claim that the denial of an application for water and sewer service and other land use decisions that prevented the construction of their church violated equal protection); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000–01 (7th Cir. 2006) (applying rational basis review to a church's equal protection claim alleging it was denied a special use permit to build a church while non-religious applicants received special use permits). Moreover, Plaintiffs' effectively pursue a "class of one" theory based on the allegation that a plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (cited by Plaintiffs).

Under rational basis analysis, a governmental action is constitutional if it is "rationally related to a legitimate government interest." *Bethel*, 706 F.3d at 561 (citation omitted). Under this standard, Plaintiffs' claim fails because upon consideration of their identified comparator, Glenstone, there is a readily identifiable rational basis for the difference in treatment. As discussed above in relation to the RLUIPA Equal Terms Claim, *see supra* part VI, Glenstone is subject to a different master plan, the Potomac Subregion Master Plan, which does not contain the same restrictive language as the BCNP's no-sewer provision. That no-sewer provision was a rational outgrowth of the concern identified in the BCNP about declining water quality in the region, and the consequent need to protect the Patuxent River tributary headwaters, which originate within the Properties. Glenstone is not located in the Patuxent Watershed and thus the concerns identified in the BCNP as to water quality and the need to protect the tributary headwaters do not apply to it. Where the two different properties are in different zones and different geographic locations with

different environmental concerns, there is a rational basis for their differential treatment as to access to public sewer.  The Court will grant the County's Motion on the Equal Protection Claim.

## VIII.   Free Exercise Claim

In asserting a claim under the Free Exercise Clause of the First Amendment, Plaintiffs argue that the BCNP, ZTA 12-13, and the County's WSCCR denials relating to the Properties infringed on their right to free exercise of religion.  Although a free exercise claim shares elements in common with a RLUIPA substantial burden claim, *see Vision Church*, 468 F.3d at 996 ("The protections embodied by the Free Exercise Clause were codified in RLUIPA § 2(a)(1)"), a free exercise claim involves analysis distinct from that required for a RLUIPA claim.

At the outset, the parties disagree on whether the identified provisions are neutral and of general applicability.  Under the Free Exercise Clause, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  A law is neutral for Free Exercise Clause purposes "if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines v. S. Carolina Dep't Corrs.*, 148 F.3d 353, 357 (4th Cir. 1998).  "[A] neutral government decision of general applicability is subject to rational basis review, even where it has the incidental effect of burdening religious exercise." *Jesus Christ is the Answer*, 915 F.3d at 265.

However, if the object of an otherwise facially neutral law or government decision "is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Church of the Lukumi Babalu Aye,* 508 U.S. at 533; *Jesus Christ is the Answer*, 915 F.3d at 265. Similarly, a law is not "generally applicable" if, even while facially neutral, it "in a selective manner imposes burdens only on conduct motivated by religious belief." *Church of the Lukumi*

*Babalu Aye,* 508 U.S. at 543.  For example, in *Church of the Lukumi Babalu Aye,* the United States Supreme Court found that a facially neutral law against ritualistic animalistic sacrifice that was drafted in a manner so that it effectively applied only to the activities of a single religious group was not generally applicable.  *See id.* at 544–46.  "A law burdening religious practice that is not neutral or of general application must undergo" strict scrutiny.  *Id.* at 546.

Turning first to the BCNP, it is undisputed that the BCNP, particularly its provision stating that "no public sewer service should be permitted for any use," is facially neutral.  J.R. 278.  Rather, Plaintiffs assert that the circumstances of its creation and adoption evince the County's desire to restrict development because of religious animus.  Plaintiffs claim that the development of the BCNP and the consideration of the New Hope WSCCR were in "lockstep," thereby suggesting that the BCNP was initiated in response to the effort to build a church on the Properties.  Pls.' Cross Mot. Summ. J. at 42, ECF No. 133.  Such a timeline misrepresents the facts.  While the Planning Board approved the Scope of Work for the BCNP in January 2011, while the New Hope WSCCR was pending, at that time, the Properties were not included within that scope.  The BCNP was instead originally focused only on Burtonsville's commercial core.  The Properties were added to the purview of the BCNP only later, and only after the Landowner Plaintiffs affirmatively requested inclusion based on hope that the Properties "would be analyzed for their highest and best use."  J.R. 1408.  The Landowner Plaintiffs then engaged in a vigorous lobbying campaign— complete with a hired attorney representative, a website, an informational booklet, and a petition— to have the Properties up-zoned for profitable townhomes.  In a June 2012 letter and at a July 2012 Planning Board meeting, Nagy, the Landowner Plaintiffs' attorney, presented this plan for Burtonsville's "new residential core," J.R. 1440, proposing a mix of townhouses and single-family homes for the Properties.  When the Properties were included in the BCNP but not rezoned, and

the BCNP included its broad exclusion of public sewer extensions to the area including the Properties, the Landowner Plaintiffs viewed the action as blocking not religious development, but their secular residential development.  In a February 22, 2013 email to his fellow Landowner Plaintiffs after the final approval of the BCNP, Mr. Norris expressed this view by stating, "I warned them that if they refused townhouses, there would be churches on this land that will not pay any taxes.  Now they look pretty stupid." J.R. 1878.  Where, at the time of the adoption of the BCNP, the operative proposal for the use of the Properties was a townhouse or other residential development aimed at rebranding the Properties as Burtonsville's new "residential core," J.R. 1440, the evidence does not support a finding that the BCNP was adopted to target religious activity.

Plaintiffs' further argument that the BCNP is not generally applicable because its sewer recommendations effectively apply only to the Properties is also unpersuasive.  Even if it is true that the Properties comprise most, though not all, of the land covered by the BCNP's public sewer restriction on the Patuxent Watershed area of the Rural Edge Neighborhood, there is no evidence that the BCNP sewer provision would "in a selective manner impose burdens only on conduct motivated by religious belief," in that it would be applicable only to religious uses of the Properties. *Church of the Lukumi Babalu Aye,* 508 U.S. at 536, 543 (noting that the particular religious practices of Santeria "alone w[ere] the exclusive legislative concern" of the challenged ordinance). Instead, the evidence is to the contrary.  As to the Properties alone, there had been a long history of development proposals, both religious and non-religious, that failed to receive approval of requested land use applications, including proposals for senior citizen housing, a dog kennel, and the townhouse development project at issue at the time of the adoption of the BCNP.  Though the determinations were made under several different master plans, the Landowner Plaintiffs have

long been aware that the County's land use restrictions relating to the Properties have consistently applied to all development, not just religious development, as reflected in Ms. Norris's assertion as part of the Burtonsville Crossing tax appeal that the Property remains undeveloped because it "is covered with restrictions that makes it impossible to build." J.R. 977. The Landowner Plaintiffs themselves acknowledged that the BCNP provisions would apply to their 2012 secular residential proposal and thus that the BCNP's recommendations doomed that enterprise. Nagy complained bitterly about this fact in his September 20, 2012 letter to the Council, stating that the BCNP recommendations amounted to "takings" rendering the Properties "virtually worthless." J.R. 1408. Finally, the no-sewer restriction does not, in fact, foreclose religious assembly entirely, because it leaves open the possibility of building a religious assembly serviced by septic, as suggested by County officials to New Hope in 2009. The Court therefore concludes that the BCNP is a facially neutral and generally applicable law and thus is subject to rational basis review. *See Bethel*, 706 F.3d at 559–61.

"[T]he relevant question under rational-basis review is whether local officials reasonably could have believed that their action was rationally related to a legitimate governmental interest." *Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 439 (4th Cir. 2002) (addressing an equal protection claim) (citation omitted). Plaintiffs cannot show that the BNCP's no-sewer provision fails to meet this standard. *See Bethel*, 706 F.3d at 561 (on a free exercise claim, placing the burden on the plaintiff to establish that a facially neutral, generally applicable regulation fails rational basis review). As discussed above, the BCNP identified a longstanding concern about declining water quality in the region, and in particular identified a need to protect the Patuxent River tributary headwaters, which originate in the Properties. *See supra* part VII. The protection of both water quality and the environment are plainly legitimate government interests. The no-sewer provision

52

is rationally related to those interests.  Here, County officials reasonably could have believed that strictly limiting the extension of sewer lines to land within the Patuxent Watershed was rationally related to ensuring the quality of the region's water supply and the health of the Patuxent Watershed.  As explained by Katherine Nelson, an environmental planner for the Planning Board who was involved in the drafting of the BCNP, sewer lines degrade over time such that effluent can seep out and jeopardize water quality, and the presence of sewer lines provides a basis for abutters to seek and receive sewer service and encourages high-density development, which also places the sensitive tributary headwater environment at risk.

As for the claim based on ZTA 12-13, the 2012 zoning amendment that reduced the imperviousness cap in the RC zone from ten percent to eight percent, Plaintiffs have not alleged in the Complaint, and in fact now acknowledge, that the eight percent imperviousness requirement was not the basis for the denial of the Canaan WSCCRs.  Plaintiffs' Statement of Facts ¶ 130, ECF No. 141. Canaan's corporate representative testified at his deposition that the eight percent requirement has "never been the problem."  J.R. 96.  Where the claims relating to New Hope are time-barred, and there is no claim or evidence that the Canaan WSCCRs were denied based on ZTA 12-13 specifically or on the ratio of the impervious surface area of Canaan's proposal generally, Plaintiffs lack standing to assert, and in any event cannot prevail on, a constitutional claim based on this provision.  *See Hollingsworth*, 570 U.S. at 704 (noting that standing requires a "concrete and particularized" injury).

Lastly, Plaintiffs briefly assert that the specific decision to deny the Canaan WSCCRs was independently a violation of their free exercise rights, and that the denial was neither neutral nor of general applicability.  Plaintiffs rely for this approach primarily on *Keeler v. Mayor & City Council of Cumberland*, 940 F. Supp. 879 (D. Md. 1996), in which the court considered a Free

Exercise claim where the relevant zoning decision had been made pursuant to a "system of exemptions and exceptions." *Id.* at 885.  Even if *Keeler* draws a relevant distinction, the Canaan WSCCRs were denied not based on terms set forth in the PIF Policy that rely on exceptions to the general Water & Sewer Plan, but based on the generally applicable no-sewer provision of the BCNP, as reflected in each of the County's reports on the WSCCRs at the various stages of the approval process.  Plaintiffs' argument therefore collapses into their claim relating to the BCNP that the Court has already discussed and resolved.  Accordingly, the Court will grant the County's Motion as to the Free Exercise Claim.

Because the Court will grant summary judgment in favor of the County on all claims, it need not address the County's remaining arguments, including those relating specifically to Defendant Leggett.

**CONCLUSION**

For the foregoing reasons, the County's Motion for Summary Judgment will be GRANTED, and Plaintiffs' Cross Motion for Summary Judgment will be DENIED.  A separate Order shall issue.

Date:   September 30, 2020                    _/s/ *Theodore D. Chuang*___
                                             THEODORE D. CHUANG
                                             United States District Judge